Corcoran *v.* McNeal, Appellant.

Argued April 20, 1960. Before JONES, C. J., BELL, MUSMANNO, JONES, COHEN and EAGEN, JJ.

*J. Harold Hughes,* for appellant.

*John S. J. Brooks,* with him *Hilferty, Brooks & Knapp,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, June 3, 1960:
John Corcoran, the plaintiff in this case, was struck and seriously injured by Russell Wall, a patron of the Palm Gardens, a tavern owned and operated by Arnold

McNeal, the defendant. Corcoran brought an action of trespass against McNeal and was awarded a verdict of $16,801. The defendant appealed, seeking judgment n.o.v., or, in the alternative, a new trial.

Reading the record sur judgment n.o.v., with all factual disputes and conflicting inferences resolved in favor of the verdict-winner, the following narrative emerges from the record. On October 20, 1956, John Corcoran, accompanied by his brother-in-law Stephen Lennon, entered "Palm Gardens" a basement tavern in Chester, and ordered beer and hamburger sandwiches which they received and consumed. About a half hour later they proceeded to leave the tavern by ascending the steps leading to the outside door. While in the rathskeller they had noticed a visibly intoxicated person of imposing physical proportions boisterously disturbing other guests, shoving them "back and forth." He stood about 6 feet high, weighed some 220 pounds and was "powerfully built", with "big arms and big chest". He maneuvered unsteadily on his feet, his voice was thick, and he drank vodka served to him by one of the bartenders.

When Corcoran and Lennon started up the flight of 14 steps, Wall followed them, offering offensive remarks. When they had reached a half-way point up the steps, Wall, without provocation, struck Lennon who retreated down the steps to the bar, complaining to the bartender and asking for assistance. The bartender ignored Lennon. His fellow-bartender offered a similar deaf ear.

During the time Lennon was remonstrating with the uninterested dispensers of alcohol at the bar, he heard anguished cries of "Oh, oh" from Corcoran, followed by what he described as a thump. He ran to the steps and got there in time to find Corcoran lying on the floor in a pool of blood, Wall standing over him, with clenched fist. Lennon returned to ask the bar-

tenders to summon the police, but the bartenders were interested in other affairs. Lennon then called the police himself from a pay station in the tavern, after which he returned to his companion who, unconscious, lay on the floor, blood seeping from his mouth, ears and nose. Fearing Corcoran might be dying, Lennon pleaded that he be taken to the hospital. Wall retorted to Lennon's lamentations and struck him two or three times, adding: "If you don't shut up, I will do the same to you."

The defendant contends on appeal that since no one actually saw Wall deliver the blow or blows which felled Corcoran, the jury's verdict as to what happened was a mere guess. A guess is an airy nothing resting on a non-existent base. The jury's finding that Wall was responsible for Corcoran's injuries was not a guess; it was a conclusion based on unrefuted and irrefutable circumstances. For fifteen or twenty minutes before Corcoran started for the steps, Wall had been acting in a belligerent manner, molesting and interfering with other patrons. He loudly ordered and noisily consumed a beverage not famous for any tranquilizing effect. After consuming the vodka, he drunkenly made his way to the steps and there, without cause, struck at Lennon. A few moments later, as Lennon grieved by the side of the prostrate body of his brother-in-law, Wall struck him again and hurled the threat already quoted: "If you don't shut up, I will do the same to you."

What more could any impartial tribunal need in the way of evidence to fasten upon Wall accountability for Corcoran's condition? He was the only one in the staircase with Corcoran; he was the only one in the tavern who, because of immediately preceding events, was resolved to violence and mischief, he was the only one to openly boast admission for what had occurred.

The tavern-owner presents a rather strange argument in this connection. He says: "Where there is but

one conclusion from an inference it is the duty of the judge to draw that conclusion and not for the jury." But surely the defendant cannot mean to argue that it was for the judge to impose liability on the defendant in a trespass case! In assumed relevancy he cites *Anthony Wayne Terrace Housing Association v. Bedio,* 186 Pa. Superior Ct. 335. That case is so obviously irrelevant to the point in issue that it would be a waste of time to dwell on it. It is enough to say that there the plaintiff brought an action of ejectment against the defendant to recover certain premises. The court, after hearing evidence, directed a verdict for the plaintiff because there was no factual dispute. The defendant there argued the case should have gone to the jury. In the case here the question of liability *did* go to the jury.

There is no restriction as to what an attorney may argue in his brief but it would seem that a slight regard for logic and the value of paper would deter counsel from citing cases which are as far removed from the immediate controversy as water is from vodka.

Of course, it could be argued, as the defendant does, with some paltry obeisance to relevancy, that Corcoran was injured not because of being struck by Wall but as the result of a scuffle. There was no substantive evidence to that effect but if surmise is to be projected through the curtain of the suppositious, one could insist that, in spite of Wall's admitted aggression, Corcoran had scuffled with Wall and came into his injuries as the result of falling down the stairs. But even that argument would not save the defendant from liability under the circumstances, because McNeal's liability does not ride on Wall's pugilistic fists. His accountability for the harm done Corcoran attaches because the jury found he had failed in two important responsibilities: One, he neglected to protect his patrons from foreseeable damage inflicted by intoxicated and unruly persons in his establishment; and two, he, through his

bartender, served intoxicating liquor to a visibly intoxicated patron at his bar.

The Act of April 12, 1951, P.L. 90, §493, 47 PS §4-493(1), provides: "It shall be unlawful: (1) for any licensee of the board, or any employe, servant or agent of such licensee of the board, or any other person, to sell, furnish or give any liquor or malt or brewed beverages, or to permit any liquor or malt or brewed beverages to be sold, furnished or given *to any person visibly intoxicated.* . ." (Emphasis supplied)

If Wall was already intoxicated when the defendant's bartender served him vodka and, because of his intoxication, he caused injury to Corcoran, it would not matter how or in what manner the injury was inflicted since the proprietor of the tavern would be liable in damages to the injured party in any event. An intoxicated person amid a group of people is a constant source of danger and hurt to those about him. He is the proverbial bull in a china shop and, of course, it is clear that when the owner of a bull is sued for damages done by his animal he cannot expect to escape liability by demanding proof as to how the bull smashed the china. He is liable for allowing the bull to be abroad unrestrained, unfettered and uncontrolled. The proprietor of an establishment whose employees pour inflammable liquid into a vessel already too full cannot plead ignorance of results when the vessel explodes from contact with the slightest spark.

The liability of a tavern proprietor for damage done a patron under the circumstances herein discussed does not depend on the statute of 1951 or any statute.

In the case of *Rommel v. Schambacher,* 120 Pa. 579, a drunken rowdy, Edward Flanagan, in a spirit of humorless levity, pinned a piece of paper to the clothing of William Rommel, and set it afire. Before the ensuing flames could be extinguished Rommel had been

seriously burned. He sued the owner of the tavern in which the incident occurred. The trial court entered a nonsuit. This Court reversed, pointing out that if the proprietor of the tavern was guilty of making Flanagan drunk or even if Flanagan came into the taproom drunk and the proprietor knew this, it was his obligation to see to it that he did no injury to his customers. Speaking through Chief Justice GORDON, this Court said: "All this is a plain matter of common law and good sense, and does not depend on the act of 1854, or any other statute. Where one enters a saloon or tavern, opened for the entertainment of the public, the proprietor is bound to see that he is properly protected from the assaults or insults, as well of those who are in his employ, as of the drunken and vicious men whom he may choose to harbor."

By way of illustration, Chief Justice GORDON referred to the case of *Pittsburg & Connellsville R. Co. v. Pillow*, 76 Pa. 510, where a railroad passenger lost an eye as the result of a drunken row between other passengers, in which row he was not involved at all. In that case this Court said: "The plaintiff lost his eye through the quarrel of a couple of drunken men, who should not have been permitted aboard the cars, or, if so permitted, should have been so guarded or separated from the sober and orderly part of the passengers that no injury could have resulted from their brawls." Applying the principle there involved to the *Rommel* case, Chief Justice GORDON said: "If, then, a railroad company is liable for the conduct of drunken men who may chance to board its cars, much more the tavern-keeper who not only permits drunken men aboard his premises, but furnishes liquor to make them drunk, and who is thus instrumental in fitting them for the accomplishment of just such an insane and brutal trick as that disclosed by the evidence of the case in hand."

Although the Act of 1854, heretofore referred to, was repealed, the principle embodied therein, to the extent that it was already part of the common law, was not repudiated. The Superior Court considered this matter thoroughly in the recent case of *Schelin v. Goldberg,* 188 Pa. Superior Ct. 341, 348, where it properly said: "The Restatement, Torts, section 483, is as follows: 'If the defendant's negligence consists in the violation of a statute enacted to protect a class of persons from their inability to exercise self-protective care, a member of such class is not barred by his contributory negligence from recovery for bodily harm caused by the violation of such statute.'

"Section 493 of the Liquor Code of 1951, supra, 47 PS §4-493, making it unlawful to sell, furnish, or give any liquor to any person visibly intoxicated was enacted to protect society generally, but to protect *specifically* intoxicated persons 'from their inability to exercise self-protective care.' " (Emphasis in original).

The court there held that even if it was the plaintiff who was the intoxicated person and was injured as the result of that intoxication, he was not barred from recovery on the basis of contributory negligence because of that fact. A fortiori, the plaintiff in this case, who was set upon by a drunken person, whose inebriation was added to by the defendant's act, would be entitled to recover.

We are satisfied that the jury's finding of liability is amply supported by the record and that the lower court did not err in refusing judgment n.o.v.

Failing to obtain a judgment n.o.v., the defendant argues that he is entitled to a new trial alleging excessiveness in the verdict. The jury returned, as already stated, a verdict in favor of the plaintiff in the amount of $16,801, made up of $423 for hospital and medical expenses, $1378 for lost wages and $15,000 for pain, suffering and inconvenience.

At an initial glance the sum of $15,000 for pain and suffering and inconvenience might seem rather substantial because these items are sometimes regarded as of less gravity than others usually encompassed in personal injury verdicts. However, pain, suffering and inconvenience in this case cover some very serious disablements even though they might not conspicuously exhibit themselves to the casual observer.

The blow or blows administered by Wall to Corcoran were of such force and power that Corcoran was rendered unconscious for a period of about a week. Dr. Henry H. Shenkin, who is chief of neurosurgery at the Episcopal Hospital in Philadelphia and consultant in neurosurgery at the Chester Hospital in Chester, testified that X-rays of Corcoran's head revealed multiple skull fractures: one 2 inches long, another $2\frac{1}{2}$ inches long, and a third an inch and a half long. He testified: "This man obviously had extensive bruises of his brain, enough to keep him unconscious for several days and enough to produce blood in the spinal fluid. . ."

The doctor testified that when Corcoran left the hospital "he was quite slowed up in his activity, in his thinking, and his memory was grossly impaired, and there was a general lowering of his mentality, and in addition a change in his personality. He was more, as we said, lethargic, slow in his reactions; and he did not seem to grasp ideas promptly as a normal person would. And in addition when he did react to a stimulus to some questioning, he would become irritated. And according to his family he was not an irritable person prior to this injury."

The doctor testified that when he examined Corcoran on November 28th, some six weeks after the occurrence at the tavern, he found the following: "My examination revealed that he spoke with what we call a scanning type of speech, it was monotonous and seemed to be broken up into unusual phrases. He had nystagmus,

which is a flickering of the eyes and indicates damage to the brain. And he staggered slightly when he walked. At this time his hearing was found to be poor, as described in my notes, poor in the left ear [he corrected this later to right ear]; and at the time I concluded from the evidences now, the staggering and the nystagmus was evidence that the cerebellum had been involved, and that is at the back and at the bottom of the brain. I felt that he had suffered a fracture of the base of the skull as well as in the parietal region."

Additional testimony in the case demonstrates that Corcoran's brain injury not only adversely affected his speech and personality but it brought about also grave damage to three of his senses. He has permanently lost the hearing in his right ear, his sense of smell has been permanently destroyed, and the sense of taste, so intimately associated with the sense of smell, no longer exists.

The defendant contends that since these physical impairments are not related to earning power they are not the subject of damages. The object of a trespass action involving personal injuries, where the plaintiff has proved his case, is to compensate him for what he has lost as a result of the defendant's negligence. The loss of well-being is as much a loss as an amputation. The inability to enjoy what one has heretofore keenly appreciated is a pain which can be equated with the infliction of a positive hurt. The conscious loss of a benefit to which one is entitled hurts as much as a festering wound.

If the suffering of the plaintiff because of the incapacities here mentioned comes under the heading of "mental suffering," he is entitled to compensation for it. Speaking of mental suffering, this Court said in the case of *Studebaker v. Pittsburgh Railways Co.*, 260 Pa. 79, 82: "It is familiar law that where such suffering is the result of physical injury it may be considered on

the question of damages. In an action for negligence there can be no recovery for mental suffering except it be founded upon physical injury, but *where such suffering is the direct and necessary consequence of the physical injury the jury may consider it*: McDermott v. Severe, 202 U.S. 600; and see Kennon v. Gilmer, 131 U.S. 22." (Emphasis supplied)

There can be no question whatsoever that the suffering of the plaintiff in this case is the direct result of the violence visited upon him by the drunken bully in the defendant's establishment.

Nor is the plaintiff's suffering to be regarded only as mere annoyance. The complete loss of hearing in one's ear is a major handicap, subjecting one not only to considerable vexation and hardship in the matter of communication but lessening one's capacity to heed warnings of the dangers and hazards rife in this modern age,—perils which announce themselves through audible manifestation and signals.

The loss of the sense of smell is one that not only deprives the victim of the joys of the flower kingdom, the country air with its meadows of olfactory delights and all that smells good in the world, but here again, as in the matter of hearing, he has been deprived of the antennae of warning against deadly perils in the way of noxious odors and asphyxiating gases.

The loss of the sense of taste is one of the most grievous of all losses in the keen enjoyment of life. There is no healthy person who does not savor the felicities of the table, the appreciation of which, aside from what is derived from their nutritional values, is dependent upon the sense of taste. One can almost say that dining constitutes a very important part of what every person seeks in the way of physical happiness. One does not need to be a gourmet, and certainly not a gourmand, to find great pleasurableness in the consumption of palatable food and refreshing beverages.

The plaintiff in this case has lost the pleasure of eating because he does not taste anything any more. As a consequence he eats inadequately and thus does not acquire enough nutrition to generate the energies needed to keep one's body up to that zestful pitch required to meet every-day responsibilities. Whereas prior to October, 1956, he was a man of vigor and enthusiasm, he is now not able to resist fatigue and tires easily. He is slow of movement and lethargic and, although only 49 years of age, gives evidence of advanced years. No one wants to believe himself growing old, nor does he want anyone else to believe he is approaching the climacteric of life, but if endurance fails him to the extent that he cannot conceal the phenomenon from others, and he is generally regarded as approaching a so-called decrepit age, he undergoes a suffering which is positive, substantial and compensable, if the premature symptoms of that Last Scene* are due to the aggression of a malefactor.

The blow to Corcoran's head brought about what is known as retrograde amnesia which made it impossible for him to recall what had happened the day the injury was inflicted. The last thing he could recall was that at about 4 o'clock of October 20, 1956, he had waved to someone and it was a day of sunshine. From then on, the sunshine disappeared for a week since he "blacked out" and did not become aware at all until the end of that period when he awakened in a hospital, his arms and legs shackled to the bed.

When he finally was allowed to leave the bed he found that his nervous system, on account of the brain

---

\* "Last scene of all,
   That ends this strange eventful history,
   Is second childishness, and mere oblivion,
   Sans teeth, sans eyes, sans taste, sans everything."
   (As You Like It, II, 7, 139).

injury, had been disturbed in such a manner that his left leg was functionally depressed and he could not walk straight.

All these sufferings and impairments are as much the direct result of the traumatic fists of Russell Wall as if they had followed one's being crushed beneath the solid wheels of a beer wagon. As recovery is allowed to athletic men for what they suffer in being unable to participate in sports they loved—swimming, running, handball, dancing, tennis, etc.—so also will this Court affirm compensation awarded by a jury for the loss of the enjoyments herein enumerated and described.

The defendant complains that the judge erred in charging on loss of future earnings. A reading of the record shows that the judge specifically charged that there could be *no* recovery for loss of future earnings. This is what happened. In his charge the judge said: "The question then arises as to whether he is entitled to be compensated for a future loss of earnings. And I charge you that if there is a clear indication that his earnings will be less because of this injury. . ." At this point defendant's counsel called attention to the fact that the plaintiff had not pleaded loss of future earnings, whereupon the court categorically declared: "I think I will rule with Mr. Hughes [defendant's counsel] on that. I think that he has not claimed any loss of future earnings. *So you will not consider loss of future earnings, which would be pretty problematical, at any rate."* (Emphasis supplied)

The defendant argues that the judge nullified this charge by later reading a few sentences from this Court's decision in *Bochar v. Martin Motors, Inc.,* 374 Pa. 240. The quotation read by the trial judge in no way affected or modified what he had said about no recovery for possible impaired future earnings. The purpose of the quotation was to instruct the jury that the fact the plaintiff was receiving the same rate of

wages as before his injuries, was in no way to affect his right to full recovery for what he has lost. This was a proper instruction.

Judgment affirmed.

Mr. Chief Justice Jones and Mr. Justice Benjamin R. Jones concur in the result.