**Connor v. Catagnus**

C.P. of Philadelphia County, July Term, no. 3247.

*Thomas J. Bass,* for plaintiff.
*Michael J. Stack, Jr.,* for defendant.

HILL, *J.,* June 12, 1997—Plaintiff Cathleen Connor brought this action for negligence against Phil Catagnus, individually and as owner of Phil's Bar, for injuries suffered while she was a patron at the bar. The case was tried without a jury. After hearing the testimony and reviewing the memoranda of law submitted by both parties, the court finds in favor of defendants Phil Catagnus and Phil's Bar and against plaintiff Cathleen Connor.

## II. FINDINGS OF FACT

*Parties and Witnesses*

(1) Plaintiff Cathleen Connor was 19 years old at the time of her injury on April 17, 1996.

(2) Defendant Catagnus is the owner of Phil's Bar, at the corner of Second and Godfrey Streets, Philadelphia, Pennsylvania.

(3) Plaintiff, a day care worker, left work on April 17, 1996, the date of her injury, between 2 and 3 p.m.

(4) Defendant has owned Phil's Bar for 11 years and has an additional 10 years of prior experience in the bar business.

(5) Christopher Felix had previously patronized Phil's Bar, but had been "flagged" and ejected from the establishment when he had attempted to start a fight there two weeks prior to the date of plaintiff's injury.

(6) Joseph Ryan, a nephew of Felix, was not a regular customer at Phil's Bar. In fact, defendant did not know him well enough to recall his last name.

(7) Jennifer Waering was a bartender on the evening of plaintiff's injury.

(8) James Bailey and Jennifer Jericho were additional patrons of Phil's Bar at that time who testified on plaintiff's behalf. Mr. Bailey was very intoxicated on the night in question, and testified that he remembered very little of what happened that evening.

## Phil's Bar

(9) Phil's Bar is located on the first floor of a 40' x 17' row house located at Second and Godfrey Streets.

(10) An oval bar fills most of the area of the one large room. Twenty five stools partially ring the bar.

(11) There is a space of about three feet between the outer edge of the bar and the 2 side walls of the building.

(12) There is one entrance at the front corner of the building and one side entrance.

(13) The seats which plaintiff and her companions occupied were located approximately three feet from the side door.

30

(14) The front entrance is usually locked at about 9 or 10 p.m. each evening, leaving the side door as the sole entrance and exit from the bar. It was the practice of defendant to keep a close watch over the door.

(15) The telephone located behind the bar is a receiving device only, and is essentially an extension to the pay phone located in the seating area of the bar. There is also an alarm system in the bar.

(16) A bartender had been shot in Phil's Bar one year prior to the incident in question. The shooting prompted defendant to adopt the policy of closing the front entrance at 9 or 10 p.m. each evening.

(17) Defendant has over 20 years of experience in the bar business. Defendant was aware that on occasions ejected patrons return to "settle a score." The testimony supports a finding that an ejected patron has never returned to any establishment owned by defendant for that purpose, except in the case at bar.

(18) Most of the regular patrons of Phil's Bar are individuals who live in the neighborhood and are known by defendant.

*Events of April 17, 1996*

(19) The court finds that plaintiff arrived at Phil's Bar around 10 or 10:30 p.m.

(20) Plaintiff was intoxicated when she arrived at Phil's Bar and was intoxicated at the time she was injured.

(21) Christopher Felix arrived at Phil's Bar for the first time at approximately 11 p.m.

(22) When Felix entered the taproom defendant was standing behind the bar.

(23) Defendant recognized that Felix was intoxicated as soon as he entered through the side door.

(24) Defendant notified bartender Waering that Felix was "flagged" from the bar, that he was not to be served and that Felix had to leave.

(25) It was defendant's experience that patrons who were refused service left the bar. It was defendant's expectation that Felix would behave similarly.

(26) Bartender Waering told Felix he would not be served and had to leave.

(27) Instead of leaving, Felix approached James Bailey, who was sitting in immediate proximity to the side entrance Felix had used.

(28) After exchanging a few words with Bailey, Felix struck the latter twice with his fists.

(29) Bailey struck Felix once in return. Felix staggered to the end of the bar, where he was then struck by Matt Waering, brother of the bartender, and fell to the floor. Bailey, who was wearing sneakers, then kicked Felix in the face.

(30) Defendant then instructed Bailey and Matt Waering to get Felix out of the bar.

(31) Bailey and Matt Waering lifted Felix by the shoulders and pushed him out the side door of the building.

(32) Defendant did not expect that Felix would turn and strike Bailey.

(33) Defendant made sure Felix had gone and then stationed himself in the general area of the side door.

(34) Defendant did not believe that Felix would return later that evening, either alone or with friends.

(35) Plaintiff shared defendant's belief that the altercation with Felix was "all over."

(36) Plaintiff shared defendant's belief that Felix would not return later that evening to "settle the score."

(37) Witness Jennifer Jericho testified that she had some concern that Felix might return later that evening to "settle the score," but did not act on her concerns at that time.

(38) Approximately five to 10 minutes after being ejected from Phil's Bar, Felix returned with a baseball bat.

(39) When Felix returned he was accompanied by three other individuals including Ryan.

(40) Felix entered the door with the baseball bat. Defendant and Bailey immediately wrestled him to the floor and grabbed the bat from him. Ryan and the two other individuals accompanying him did not enter the bar beyond the threshold.

(41) As Felix, Bailey and defendant were grappling on the floor, Ryan threw a 40-ounce beer bottle into the bar from where he was standing at the threshold of the building.

(42) The beer bottle thrown by Ryan struck plaintiff in the face, causing severe injuries to her mouth and teeth.

## III. CONCLUSIONS OF LAW

Plaintiff argues that the defendant was negligent in the exercise of his duty of care toward her as a patron in his establishment. Plaintiff contends that defendant was negligent when he failed to immediately eject Felix from the bar the first time he arrived that evening, *plaintiff's memorandum of law,* p. 4.; also, counsel for plaintiff stated in his closing argument, "if Felix isn't allowed in the bar the first time, the second incident never occurs." The court finds defendant acted rea-

sonably when he instructed the bartender not to serve Felix in lieu of immediately confronting him with physical ejectment. As noted, Ms. Waering, the bartender, did tell Felix to leave. Plaintiff also contends defendant negligently failed to take "the reasonable steps that a reasonable person under these circumstances should have taken." (Plaintiff's closing argument.)

The mere happening of an injury does not raise a presumption of negligence on the part of a defendant. *Moultrey v. Great A & P Tea Co.,* 281 Pa. Super. 525, 530, 442 A.2d 593, 595 (1980). Additionally, "[t]he burden of proving the existence of negligence rests upon the party who has asserted it." *Schmoyer v. Mexico Forge Inc.,* 437 Pa. Super. 159, 163, 649 A.2d 705, 707 (1994).

It is certainly true that intoxicated persons frequently act in unpredictable ways. Nonetheless, the court cannot find that defendant was negligent for failing to anticipate that Ryan, a third party not involved in the earlier incident, might return as a reinforcement and throw a bottle in the direction of plaintiff, a bystander.

### A. Plaintiff Failed to Show by a Preponderance of the Evidence that Defendant was Negligent in his Failure to Foresee Felix's Return, or Ryan's Return with Felix

The court finds that it is more likely than not that Felix's return to Phil's Bar after his ejectment and, more importantly, Ryan's return with Felix, was not an event reasonably foreseeable by defendant. The court bases this finding on the following facts:

(a) Defendant followed his normal procedure of refusing to serve Felix, a former patron who had been

"flagged" for previously causing trouble in the bar. (F.F. 5, 24.)

(b) Defendant has over 20 years in the bar business, and it is his experience that patrons who are refused service invariably leave. (F.F. 4, 25.)

(c) It was defendant's expectation that Felix would leave the bar once he was denied service. (F.F. 25.)

(d) Although he has seen it occur in other places, defendant has never had an ejected patron return to his bar seeking to "settle a score." (F.F. 17.)

(e) Defendant did not believe that Felix would return later that evening to "settle a score," either alone or with friends. (F.F. 34.)

(f) Plaintiff herself believed that the incident was finished with Felix's initial ejection, (F.F. 35) and did not believe that Felix would return to "settle a score." (F.F. 36.)

(g) Only one witness to the initial altercation, Jennifer Jericho, testified that she had some concern that Felix might return; however, her concern was not strong enough to prompt her to action or to even voice concern. (F.F. 37.)

(h) There is no evidence that Ryan was present when Felix had been "flagged" two weeks earlier or when Felix was initially ejected on April 17, 1996. Furthermore, Ryan was not a regular customer, and defendant had no knowledge of Ryan except for his first name. (F.F. 6.)

(i) One year prior to the incident, a bartender was injured during a shooting incident at Phil's Bar. The shooting incident prompted defendant to begin closing the front door to the bar at 9 or 10 p.m. each evening. (F.F. 16.)

In Pennsylvania, a tavern owner has a duty to protect his patrons from reasonably foreseeable harm caused by third parties. *Corcoran v. McNeal,* 400 Pa. 14, 18, 161 A.2d 367, 370 (1960); *Ash v. 627 Bar Inc.,* 197 Pa. Super. 39, 42, 176 A.2d 137, 139 (1961). It is also axiomatic that the danger to patrons must be reasonably foreseen before a duty attaches. Plaintiff argues that the fact that Felix had to be ejected should have alerted defendant to the possibility that Felix would return and endanger persons at the bar.

In *Mathis v. United Engineers and Constructors Inc.,* 381 Pa. Super. 466, 544 A.2d 96 (1989), the Pennsylvania Superior Court stated: "[T]he wrongful actions of a third party are not deemed to be foreseeable simply because the defendant could have speculated that they might conceivably occur. 'Want of ordinary care consists in failure to anticipate what is reasonably probable—not what is remotely possible.' " *Id.* at 474, 544 A.2d at 100. (citations omitted)

Cases dealing with a tavern owner's duty of care, presented by plaintiff in support of her position, address foreseeable situations dissimilar to those in the case at bar.

In *Corcoran,* the tavern had served the plaintiff's assailant while he was visibly intoxicated and after he had exhibited aggressive and violent behavior in the bar. *Id.* at 19, 161 A.2d at 370. The *Corcoran* court relied on the 1887 case of *Rommel v. Schambacher,* 120 Pa. 579, 11 A. 779 (1887), quoting the following statement from that case: "[w]here one enters a saloon or tavern ... the proprietor is bound to see that he is properly protected from the assaults or insults . . . of the drunken and vicious men whom he may choose to harbor." *Id.* at 20, 161 A.2d at 371. The *Corcoran* court further stated:

"An intoxicated person amid a group of people is a constant source of danger and hurt to those about him. He is the proverbial bull in china shop . . . [the owner] is liable for allowing the bull to be abroad unrestrained, unfettered and uncontrolled. The proprietor of an establishment whose employees pour inflammable liquid into a vessel already too full cannot plead ignorance of results when the vessel explodes from contact with the slightest spark." *Id.* at 19, 161 A.2d at 370.

In fact, plaintiff's assailant, Ryan, had not been present when Felix had been ejected from the bar earlier in the evening. Also at that time the bar had refused to serve Felix and he had been treated in a manner which would have discouraged most people from returning.

More to the point, *Corcoran* does not set forth guidelines as to how a barkeep could foresee that an individual patron who had been ejected following a brawl would later return with an accomplice who would then assault a different patron who had not been involved in the earlier incident. There is no evidence that Felix deliberately solicited Ryan as opposed to the happenstance of simply running into him after his ejectment. Foreseeability, as expounded in *Corcoran,* revolved around a tavern owner's liability for the action of a drunken patron he permitted to remain in his establishment, a scenario not present instantly.

On the other hand, in *Ash,* the defendant was charged with negligence in failing to foresee an assault on a patron by a bartender because of the general atmosphere of "disorder, gaming, petty theft and threat" prevailing in the bar. *Id.* at 42, 176 A.2d at 139. The *Ash* court found that the bartender's encouragement of shuffleboard gambling, coin tossing, and threats of violence for alleged failure to pay for drinks created the general

atmosphere complained of above. *Id.* at 41, 176 A.2d at 138. In the case at bar, plaintiff contends in his closing argument that the court must consider the likelihood of past criminal behavior having occurred on the premises, and argued that the defendant's bar is located "not [at] Gladwyne, . . . not [at] Ardmore, [but at] Second and Godfrey where shootings take place, where people use drugs, where people drink to excess, where they start fights in bars and even though they have been flagged they come back in and start more fights in bars."

Along this line the record does establish that a shooting in Phil's Bar injured a bartender a year prior to the incident in question and that defendant regularly violated the law by selling liquor to minors. In fact plaintiff, a minor, was intoxicated when she was hit by the bottle. Also, the extent to which defendant would sell liquor to inebriates is not clear. Certainly, he did sell liquor to inebriates on the date of the incident.

There is, however, no evidence concerning the details of the shooting or that any failure by defendant to maintain order at the time brought it about. Similarly, there is no evidence that defendant's failure to enforce the liquor laws brought about the prior shooting; one can only speculate. While the facts indicate that liquor was sold to minors—an inexcusable transgression of the law—there is nothing in the record to support a finding that the "disorder," "theft" or "threat" referred to in *Ash, supra,* prevailed in Phil's Bar.

Furthermore, except for the fact that Felix had been "flagged" two weeks before the April 17, 1996 incident for trying to start a fight, there is no evidence that the "fights" referred to by counsel for plaintiff in his

closing speech had, in fact, taken place. Similarly, there is no evidence that the "drugs" referred to in counsel's speech were part of the scene.

What the evidence does indicate is that defendant did "flag" Felix on an earlier occasion, did refuse to sell him liquor on April 17, 1996, stationed himself in the area of the door after Felix had been ejected and took immediate action together with Bailey to neutralize Felix when he returned. Defendant did not anticipate that Felix would be accompanied by another who would hurl a bottle into the bar from the doorway.

This is a close case. In its final analysis, the court finds that plaintiff failed to meet the burden imposed on her of proving by a fair preponderance of the evidence that a reasonable person in defendant's position would have foreseen the incident complained of by plaintiff.

The uncontroverted testimony of defendant Catagnus, who was called as on cross-examination, was that in his experience as a bartender and an owner, no customer who had been flagged had ever returned to "settle a score." When a party is called as on cross-examination, the other party is bound by his testimony unless it is rebutted or inherently incredible. *Gaul v. Consolidated Rail Corp.,* 383 Pa. Super. 250, 261 n.3, 556 A.2d 892, 897 n.3 (1989). In short, this is not the *Ash* case, where the atmosphere was charged with a high level of criminal behavior and threat, according to the description in the opinion.

On these facts, the court is unable to conclude that defendant acted unreasonably in failing to anticipate that Felix would return after being once ejected from the bar, and beyond that, bring along an accomplice who would injure a bystander such as plaintiff. Significantly, plaintiff herself considered such a possibility remote.

## B. Plaintiff Failed to Show by a Preponderance of the Evidence that Defendant was Negligent in the Actions he Took to Protect his Patrons after the Initial Ejectment of Felix

The court bases this conclusion on the following facts:

(a) Phil's Bar is a small, neighborhood corner bar, with occupancy limited to approximately 25. (F.F. 9-11.)

(b) Defendant regularly closes the front entrance to his establishment at 9 or 10 p.m., allowing only the side door for access in and out, which defendant watches regularly. (F.F. 14.)

(c) Although defendant conceded the possibility that Felix might have hung around the entrance after being ejected, defendant checked the street outside to make certain Felix had gone. (F.F. 33.)

(d) Defendant remained near the side door, in the area between the side door and the bar, after Felix was ejected. (F.F. 33.)

(e) Defendant and plaintiff both considered the incident with Felix over, and expected no further trouble from him that evening. (F.F. 34-36.)

(f) Witness Jennifer Jericho evidenced no action at the time which would express her alleged concern over the possibility Felix might return. (F.F. 37.)

(g) When Felix returned with a baseball bat, defendant immediately subdued him. (F.F. 38, 40.)

(h) The 40-ounce bottle that injured plaintiff was thrown by Ryan, who was not within the bar proper at any time relevant to this incident. (F.F. 41.)

(i) Most of the patrons of Phil's Bar were neighborhood people, well-known to defendant. (F.F. 18.)

As a result of the shooting a year prior to the incident in question, defendant closed the front entrance to his bar every night, leaving only one side entrance where he could more closely scrutinize the comings and goings of his clientele. Because of the size of Phil's Bar, and the fact that most of the regular customers were neighborhood people, defendant saw no need for tighter security.

Relevant to this inquiry, however, was defendant's call to exercise his duty the instant Felix entered Phil's Bar with a baseball bat. Obviously, Felix was intent on exacting revenge for the drubbing he had previously received at Bailey's hands. Defendant's response to this situation was swift. Together with Bailey, he subdued Felix and relieved him of his bat. Such a response was inarguably a reasonable response to that particular threat. Additionally, there is no evidence that while defendant was grappling with Felix over the bat on the floor, he was even aware of Ryan's presence outside the entrance. Defendant's failure to focus his concern on Ryan, plaintiff's actual assailant, rather than Felix, a clear and present danger to his patrons, was not negligence.

Plaintiff suggests alternative steps defendant might have taken to protect his patrons from harm. Among these are the suggestions that defendant could have closed his bar early that night, that he could have told his patrons to leave, he could have locked the door and admitted patrons only after observing them through the window, or he could have called the police. In the court's opinion, a reasonable person in defendant's position would have been required to take these steps had it been foreseeable to that person that a patron in the bar would be injured had such steps not been taken. As previously noted, the court has found that

plaintiff failed to prove that what happened to her would have been foreseen by a reasonable person in the position of defendant.

Accordingly, the court finds in favor of defendants Phil Catagnus and Phil's Bar, and against plaintiff Cathleen Connor. In reaching this decision, the court, while recognizing that plaintiff was severely injured, is required to decide this case on the facts and not on sympathy.

## ORDER

And now, to wit, June 12, 1997, after a non-jury trial held in this matter, the court finds in favor of defendants Phil Catagnus and Phil's Bar, against plaintiff Cathleen Connor.