Brandi ALEXANDER,

v.

UNITED STATES of America.

No. CIV.A. 98–CV–4103.

United States District Court, E.D. Pennsylvania.

Feb. 12, 2001.

## DECISION

JOYNER, District Judge.

Plaintiff, Brandi Alexander, commenced this civil action against the defendant United States to recover monetary damages for the personal injuries which she sustained in an automobile accident which occurred on May 23, 1995. This matter was heard non-jury before the undersigned on May 30, 31 and June 1, 2000 and, pursuant to Fed.R.Civ.P. 52, we now make the following findings of fact and conclusions of law:

### Findings of Fact

1. On May 23, 1995, Plaintiff was the front seat passenger in an automobile traveling westbound and stopped for traffic in the right lane on Route 22 in Bethlehem Township, Northampton County, Pennsylvania when the vehicle in which she was riding was struck in the rear by a vehicle owned by the United States Postal Service and then being operated by its employee, Melvin Lebo. At the time of the impact, Mr. Lebo's vehicle was traveling at 50–55 miles per hour and it struck the plaintiff's vehicle with such force as to spin it around some 180 degrees and force it into the north berm of the roadway. (N.T. Vol. I, pp. 14–16, 18; Defendant's Exhibit 60).

2. The Government defendant has stipulated to liability in this case. (N.T. Vol. I, 6).

3. As a result of this collision, Plaintiff suffered injuries to the top of her head, shoulder, neck and chest. She was taken to the Muhlenberg Hospital Center Emergency Room, where x-rays of her cervical spine and skull were negative for fracture. She was diagnosed as having suffered an acute cervical strain and released. (N.T. Vol. I, 18–19; Pl's Exhibit 5).

4. Once home, Plaintiff continued to experience pain in her neck, shoulder and chest and began experiencing pain in her low back. On May 25, 1995, she consulted Emil J. DiIorio, M.D., an orthopedic surgeon with Coordinated Health Systems in Bethlehem, PA, who diagnosed her as hav-

ing sustained acute lumbar and thoracic strain, cervical whiplash and left shoulder contusion, referred her to physical therapy with Coordinated Health Systems, and directed that she undergo an EMG, which subsequently proved negative. (N.T. Vol. I, 20; Pl's Exhibit 6; Emil DiIorio Dep., 7–8).

5. On May 25, 1995, Plaintiff began physical therapy at the Coordinated Health Systems. She thereafter received therapy for the next five years, receiving heat treatments, range of motion, stretching and strengthening exercises and hydrotherapy.[1] (N.T. Vol. I, 20–22; Pl's Exhibit 8).

6. In June, 1995, Dr. DiIorio and her physical therapist, Gary Schoenberger, referred her to Paul Duffy, D.C., of the Coordinated Health Systems Chiropractic Department for chiropractic treatments and manipulations. Upon examination of the plaintiff, Dr. Duffy determined that she had sustained a cervical strain and sprain and sacroiliac strain and she thus began chiropractic treatments with him three times weekly. (Pl's Exhibit 7; Defendant's Exhibit 17; N.T. Vol. I, 26).

7. Although Plaintiff's neck and shoulder pain were resolved by late summer, 1995, she continued to be plagued by low back pain. In addition to receiving physical therapy treatments for some five years, she received chiropractic manipulations twice weekly until October, 1995 and once weekly thereafter until July, 1997 when Dr. Duffy discharged her to a fitness program. (Pl's Exhibits 7, 8 and 9; Defendant's Exhibit 17; DiIorio Deposition, 8–10).

8. Plaintiff continued to see Dr. DiIorio on a regular, once-a-month basis at least until March, 2000. Although an MRI in January, 1996, was normal, Dr. DiIorio's examinations would periodically reveal evidence of a pelvic obliquity and leg length discrepancy and muscle spasms and he therefore diagnosed Plaintiff as having sacroiliac joint dysfunction and chronic mechanical low back pain. In September, 1998, he referred her to Nathan Schwartz, M.D. a Coordinated Health Systems' Pain Management specialist. (Defendant's Exhibit 16).

9. Plaintiff was examined for the first time by Dr. Schwartz on September 25, 1998. Following that examination, Dr. Schwartz determined that Plaintiff had "chronic post-traumatic lumbar zygapophyseal (facet joint) dysfunction, facet joint pain syndrome and a chronic myofascial painful complaint syndrome for which he recommended diagnostic and therapeutic lumbar injection of cortical steroids in order to decrease the inflammatory component of her post-traumatic joint dysfunction". (N.T. Vol. I, 27–28; Defendant's Exhibit 19; Plaintiff's Exhibit 10; Schwartz Deposition, 17).

10. On September 29, 1998, Plaintiff received her first facet joint injection at the L3–4, L4–5 and L5–S1 levels, under anesthesia. A second injection was performed on October 13, 1998. Although Plaintiff had immediate and almost complete relief of her pain, the relief was temporary. In January, 1999, Dr. Schwartz began treating Ms. Alexander by periodically performing radio frequency ablations of the facet nerve, a procedure by which a long spinal needle with an electrical device at its tip is inserted into the affected areas and used to cook and destroy the nerve. Although these treatments also afford temporary pain relief, the relief is of longer duration (6–8 months) than that provided by the facet injections. Plaintiff has received a total of six such radio frequency ablations to date. (Schwartz Deposition, 20–29).

11. The use of facet joint injections as a diagnostic tool and of radio frequency ablations as a treatment for lumbar pain is controversial because there is a significant placebo effect that follows both types of

---

1. Plaintiff received physical therapy some three times per week, although her therapy was periodically interrupted by her frequent hospitalizations for abdominal pain.

treatments. (Spellman Deposition, 61, 63–64, 86–90).

12. Between May 23, 1995 and June 1, 1999, Plaintiff was hospitalized some 14 times and had an additional nine emergency room visits for abdominal pain, cramping, diarrhea and vomiting with no determined cause. Throughout all of these hospitalizations, and despite her testimony that her back pain was "unbearable" when she was hospitalized because of "having to be in the bed," Plaintiff only complained of back pain on two occasions and included her automobile accident of May 23, 1995 and her back problems on only one occasion when asked by hospital personnel about her past medical history. (N.T. Vol. I, 29–30, 52–54; Defendant's Exhibits 30–55, 61).

13. Until she began treating with Dr. Schwartz, Plaintiff never requested any medication to alleviate her low back pain. She has never been hospitalized for her back pain or her back injuries. (N.T. Vol. I, 45–48).

14. At present, Plaintiff continues to experience episodes of low back pain which vary in severity and it is possible that she will continue to have intermittent back pain for an indeterminate period of time in the future. She is unable to lift more than 10 pounds and no longer participates in many of the activities that she did before the accident such as aerobics, tennis and bike riding, although there is no evidence that she has discontinued these activities on the orders of her doctors. (N.T. Vol. I, 31–33; DiIorio Deposition, 15–16; Defendant's Exhibit 17.) Nevertheless, Plaintiff has been able to take numerous vacations since the May 23, 1995 accident, including two trips to Canada by car, and trips to Las Vegas, Aruba, Turks and Caicos by air. (N.T. Vol. I, 39–41).

15. Plaintiff's low back pain is the result of the injuries which she sustained in the May 23, 1995 accident. (DiIorio Deposition, 17–18). She is not a candidate for surgery, as her condition is not generally treated surgically. (Plaintiff's Exhibit 32).

16. Several of Plaintiff's treating physicians and at least one psychiatrist have suspected that she suffers from Munchausen's Syndrome with respect to her abdominal complaints. Munchausen's Syndrome is a Factitious Disorder in which physical or psychological symptoms are intentionally produced in order to assume the sick role. Factitious Disorders are distinguished from acts of malingering in that while malingering also involves the intentional production of symptoms, there is an obviously recognizable goal, i.e., to get money, to be excused from school or work, etc. (Defendant's Exhibit 25; N.T. Vol. II, 80–94).

17. Plaintiff has not exhibited any signs that she suffers from a factitious disorder with respect to the injuries which she sustained in the accident of May 23, 1995; however, she has exaggerated the symptoms and pain which she suffered as a result of this accident. (N.T. Vol. II, 94).

## *Discussion*

Plaintiff brought this suit pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346, which states, in relevant part:

**(b)** Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

With respect to tort claims as to which the United States has waived its

sovereign immunity, the FTCA requires the court to apply the substantive law of the place where the event occurred. *Castro v. United States*, 34 F.3d 106, 110 (2nd Cir.1994); *Daugherty v. United States*, 427 F.Supp. 222, 224 (W.D.Pa.1977). Additionally, under § 2674 of the Federal Tort Claims Act, 28 U.S.C., the United States is liable to the same extent as an individual in similar circumstances, except that the United States is not liable for prejudgment interest or punitive damages. As under § 1346, the law of the place where the negligence occurred governs; hence state law controls both as to liability and damages. *Bankert by Bankert v. U.S.*, 937 F.Supp. 1169, 1180 (D.Md.1996), citing, *inter alia, United States v. Muniz*, 374 U.S. 150, 153, 83 S.Ct. 1850, 1852–53, 10 L.Ed.2d 805 (1963).

■ It is axiomatic that under Pennsylvania law, a cause of action for negligence requires a showing of a duty, a breach of that duty, a causal relationship between the breach and the resulting injury and actual loss. *Campo v. St. Luke's Hospital*, 755 A.2d 20, 23–24 (Pa.Super.2000);. *See Also: Gardner by Gardner v. Consolidated Rail Corp.*, 524 Pa. 445, 454–455, 573 A.2d 1016, 1020 (1990). In this case, of course, negligence has been established as the government has stipulated to liability. Hence, we turn to the issue of damages.

■ Generally, victims are entitled to be compensated for all of their losses caused by negligence of another. *Nudelman v. Gilbride*, 436 Pa.Super. 44, 51–52, 647 A.2d 233 (1994). Under Pennsylvania law, "[t]he object of a trespass action involving personal injuries, where the plaintiff has proved his case, is to compensate him for what he has lost as a result of the defendant's negligence. The loss of well-being is as much a loss as an amputation. The inability to enjoy what one has heretofore keenly appreciated is a pain which can be equated with the infliction of a positive harm." *Lebesco v. Southeastern Pennsylvania Transportation Authority*, 251 Pa.Super. 415, 424, 380 A.2d 848, 852 (1977) quoting *Corcoran v. McNeal*, 400 Pa. 14, 23, 161 A.2d 367, 373 (1960) Thus, when a tort-feasor's negligence diminishes the plaintiff's well-being, the plaintiff may recover for that loss. *Id. See Also: Willinger v. Mercy Catholic Medical Center*, 241 Pa.Super. 456, 362 A.2d 280 (1976).

■ However, not every injury results in compensable pain. *Nudelman v. Gilbride, supra.,* citing *Boggavarapu v. Ponist*, 518 Pa. 162, 166–67, 542 A.2d 516, 518 (1988) and *Hawley v. Donahoo*, 416 Pa.Super. 469, 470–71, 611 A.2d 311, 312 (1992). There are injuries to which human experience teaches there is accompanying pain. *Boggavarapu*, 518 Pa. at 162, 542 A.2d at 518. Those injuries are obvious in the most ordinary sense: the broken bone, the stretched muscle, twist of skeletal system, injury to a nerve, organ, or their function, and all the consequences of any injury traceable by medical science and common experience as sources of pain and suffering. *Id.* However, the factfinder, having seen and heard the plaintiff, her doctors, and other witnesses is "not required to accept everything or anything the plaintiff and her doctor [or other witnesses] said, even if their testimony was uncontradicted," nor are they compelled to find pain where there was no objective injury. *Nudelman*, 436 Pa.Super at 52, 647 A.2d 233, quoting *Bronchak v. Rebmann*, 263 Pa.Super. 136, 140–41, 397 A.2d 438, 440 (1979); *Boggavarapu*, 542 A.2d at 519.

■ In this case and despite the negative results of the X–Rays, MRI and EMG, we find that Ms. Alexander did sustain injuries to her neck, shoulder and lower back in the May 23, 1995 accident which caused her to suffer varying degrees of pain over the last five years and which has caused her to curtail many of the physical activities in which she periodically engaged before the accident. Fortunately for the plaintiff, her neck and shoulder problems resolved within a few months of the accident date, although she continued to suffer and still does suffer from intermittent low

back pain of varying degrees of severity. While we believe that Plaintiff's pain is worse at some times than at others, we also find that Plaintiff has exaggerated the extent of her discomfort as evidenced by her hospital and college records and vacation history. Accordingly, we believe that an award of $50,000.00 is appropriate to compensate Ms. Alexander for her injuries.

### Conclusions of Law

1. This Court has jurisdiction over the subject matter and the parties to this action pursuant to 28 U.S.C. § 1346(b).

2. Defendant is liable to the plaintiff for the injuries which she sustained as a result of the accident of May 23, 1995 with postal worker Melvin Lebo's vehicle.

3. Judgment in the amount of $50,000.00 is properly entered in favor of the plaintiff and against the defendant as compensation for the personal injuries which Plaintiff suffered in the May 23, 1995 accident.

An order follows.

### ORDER

AND NOW, this day of February, 2001, following non-jury trial and for the reasons set forth in the preceding Decision, it is hereby ORDERED and DECREED that Judgment is entered in favor of the Plaintiff, Brandi Alexander and against the Defendant, United States of America in the amount of $50,000.00.