**[J-14-2023]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**

| | | |
|---|---|---|
| DAVID KLAR, | : | No. 29 WAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court entered December |
| | : | 17, 2021 at No. 1280 WDA 2020, |
| v. | : | affirming the Order of the Court of |
| | : | Common Pleas of Lawrence County |
| | : | entered October 4, 2017 at No. |
| DAIRY FARMERS OF AMERICA, INC., A | : | 2015-10863. |
| CORPORATION, AND ROGER J. | : | |
| WILLIAMS, AN INDIVIDUAL, | : | ARGUED:  April 18, 2023 |
| | : | |
| Appellees | : | |

**OPINION**

**JUSTICE WECHT**                                         **DECIDED: AUGUST 22, 2023**

In Pennsylvania, civil liability arising from the provision of alcohol to visibly
intoxicated persons lies at an intersection of statutory and decisional law.  This case calls
upon us to revisit precedents that have prevailed for half a century and that impose such
liability upon persons and entities licensed to engage in the commercial sale of alcohol
while limiting the liability of non-licensees and "social hosts."  The lower courts applied
these precedents to conclude that an organization which hosted an event at which alcohol
was provided, but was not a liquor licensee, could not be held liable for injuries caused
by a guest who became intoxicated at the event.  Finding no basis to disturb the long-
settled law of Pennsylvania, we affirm.

**I.**

As the instant appeal arises from a grant of judgment on the pleadings, we take the relevant facts as alleged in the complaint filed by the injured party, David Klar. On August 17, 2014, Dairy Farmers of America, Inc. ("DFA") sponsored a golf outing for its employees at Tanglewood Golf Course in Mercer County. As a condition of attendance, DFA required employees to provide a "monetary contribution to offset costs and expenses" associated with the event, which it used to pay for items such as "greens fees, food and alcohol."[1] One of DFA's employees, Roger Williams, made the contribution and attended the golf outing. According to Klar, DFA had reason to know that Williams was an alcoholic and that he previously had been arrested for driving under the influence of alcohol. At the event, Williams' alcohol consumption was unsupervised, and he drank beyond the point of visible intoxication.

At about 5:45 p.m., with a blood alcohol concentration of approximately 0.23%—nearly three times the legal limit[2] to drive in Pennsylvania—Williams departed the golf outing in his car. As he drove north along State Route 18, Williams encountered Klar, who was operating a motorcycle in the southbound lane. Williams swerved across the center line into Klar's path. The resulting collision caused Klar to suffer numerous and grievous injuries.

Klar sued both Williams and DFA, contending that they were jointly and severally liable for his injuries. Klar's cause of action against Williams was straightforward. As for DFA, Klar asserted that it should be held liable due to its acts of "furnishing, serving and

---

[1]     Complaint ¶ 9.

[2]     *See* 75 Pa.C.S. § 3802(a)(2) ("An individual may not drive, operate or be in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the alcohol concentration in the individual's blood or breath is at least 0.08% . . . within two hours after the individual has driven, operated or been in actual physical control of the movement of the vehicle.").

providing Williams alcohol" when DFA "knew or should have known Williams was visibly intoxicated and/or a habitual drunkard."[3]  Although Klar emphasized that DFA collected funds from its employees to pay for the event, he did not allege that DFA realized any profit from the sale of alcohol, nor that DFA intended to do so.  Rather, Klar described a communal pooling of money, used collectively to purchase items to be shared among the event's attendees, including alcohol.  DFA ultimately filed a motion for judgment on the pleadings, arguing that it could not be held liable for Klar's injuries because it was not a "licensee" for purposes of the Liquor Code,[4] that it did not take on "licensee status" by virtue of the funds it collected to pay for the golf outing, and that it was instead merely a "social host" that was not responsible for the actions of its guest.

The trial court granted the motion and dismissed Klar's claims against DFA.  With regard to the theory of negligence *per se* arising from a purported violation of Section 493(1) of the Liquor Code ("Section 493(1)" or the "Dram Shop Act"),[5] the trial court found that the question of DFA's liability effectively was answered by this Court's decision in *Manning v. Andy*, in which we stated that "[o]nly licensed persons engaged in the *sale* of intoxicants have been held to be civilly liable to injured parties," and rejected the imposition of Dram Shop liability upon "nonlicensed persons" who "furnish intoxicants for

---

[3]     Complaint ¶ 33.

[4]     Act of April 12, 1951, P.L. 90, *as amended*, 47 P.S. §§ 1-101 – 10-1001.

[5]     47 P.S. § 4-493(1).  The text of this provision is discussed in detail below.  The Dram Shop Act does not create a private cause of action in itself, but we have held that "a violation of this statute is negligence *per se* and, if the violation was the proximate cause of [the] plaintiff's injury, [the] defendant is liable for it."  *Majors v. Brodhead Hotel*, 205 A.2d 873, 875-76 (Pa. 1965).  Although, for ease of discussion, we refer to this form of civil exposure as "Dram Shop liability," as a technical matter the defendant's liability does not flow automatically from a statutory violation, but rather from a civil action premised upon a theory of negligence *per se*.

no remuneration."[6]  Because DFA was not licensed to sell alcohol, it appeared to fit into the latter category.  However, the trial court recognized that Klar had at least plausibly suggested that DFA's collection of funds from its employees could constitute a "sale" of alcohol or the receipt of "remuneration" for it.  Indeed, the Liquor Code defines a "sale" broadly to "include any transfer of liquor, alcohol or malt or brewed beverages *for a consideration.*"[7]  Given this wide-ranging definition, the trial court reasoned that "collective action to purchase alcohol presents a problem of consistency" with the proposition that social hosts are not exposed to liability.[8]  For instance, the trial court hypothesized, "[i]f two friends were to come to an agreement whereby one person were to purchase food, and the other person were to purchase alcohol, and they were to share both, under contract principles of 'consideration,' that agreement would qualify" as a "sale" by a strict reading of the definition.[9]  But under any reasonable understanding of what it means to be a "social host," the trial court opined, it would be absurd to conclude that such sharing would constitute a "sale" of alcohol from one friend to the other that would trigger liability under the Dram Shop Act.

Essentially, because DFA pooled its employees' money to purchase alcohol that they all shared, the trial court concluded that the instant circumstance was more analogous to the hypothetical friends sharing a meal and a drink than to the unlicensed commercial sale of alcohol.  This conclusion was bolstered by the "non-proportional distribution of the alcoholic beverages" at the golf outing, *i.e.*, that there was no "relation between the amount of alcohol consumed at the event . . . and the amount to be paid in

---

[6]    *Manning v. Andy*, 310 A.2d 75, 76 (Pa. 1973) (*per curiam* opinion) (emphasis in original).

[7]    47 P.S. § 1-102 (emphasis added).

[8]    Trial Ct. Op., 10/4/2017, at 7.

[9]    *Id.*

reimbursement of the cost of the alcohol."[10] That is, the alcohol was available to all of the attendees on a self-serve basis, and no one was accepting money on a per-drink basis, as one might expect from an enterprise engaged in the business of selling alcohol. In sum, the trial court reasoned:

> For negligence *per se* under the Dram Shop Act, the Plaintiff bears the burden of showing the Defendant is either a licensee, or stepped into the shoes of a licensee. The payment of a fee in this case to [defray] the cost of the golf outing as a whole, with alcohol being only an incidental aspect of the fee which also provided for food and the golfing itself, without profit or other indicia of commercial sale of liquor, does not satisfy the burden of the Plaintiff to meet all the elements of its cause of action.[11]

Apart from the theory of negligence *per se* derived from the asserted violation of the Dram Shop Act, the trial court further rejected any claim against DFA sounding in ordinary common-law negligence principles. On this score, the trial court reasoned that Klar's claim was foreclosed by this Court's decision in *Klein v. Raysinger*, which held that social hosts are not subject to liability in common-law negligence for the actions of their guests, because, "in the case of an ordinary able bodied man it is the consumption of the alcohol, rather than the furnishing of the alcohol, which is the proximate cause of any subsequent occurrence."[12] Because the trial court already had deemed DFA to be a

---

[10]     *Id.* at 7-8.

[11]     *Id.* at 11.

[12]     *Klein v. Raysinger*, 470 A.2d 507, 510 (Pa. 1983). *Klein*'s caveat relating to the responsibility of an "ordinary able bodied man" served to distinguish the matter from its sister case decided on the same day, *Congini by Congini v. Portersville Valve Co.*, 470 A.2d 515 (Pa. 1983), which allows for liability where an individual provides alcohol to a minor, who then causes some injury as a result. *Id.* at 518 ("[W]e find that defendants were negligent *per se* in serving alcohol to the point of intoxication to a person less than twenty-one years of age, and that they can be held liable for injuries proximately resulting from the minor's intoxication.") (footnotes omitted). The instant case does not involve any allegation concerning provision of alcohol to minors.

social host rather than a *de facto* liquor licensee, and "given that no common law negligence action exists in Pennsylvania against a social host" per *Klein*,[13] the court reasoned that Klar's claim was barred as a matter of law.

On Klar's appeal, the Superior Court affirmed.[14] It agreed with the trial court's application of the above precedents in all material respects. In so doing, the Superior Court rejected certain arguments that Klar now reiterates before this Court. Principally, Klar emphasized that, this Court's decision in *Manning* notwithstanding, the language of the Dram Shop Act facially applies to a much broader range of persons and entities than just "licensees," inasmuch as it prohibits "any licensee or the board,[15] or any employe, servant or agent of such licensee or of the board, *or any other person*" from selling, furnishing, or giving alcohol to a visibly intoxicated person.[16] Although DFA indisputably was not a "licensee," Klar contended that it fell into the category of "any other person," and thus was subject to the Dram Shop Act. As support, Klar cited the Superior Court's 1957 decision in *Commonwealth v. Randall*,[17] which held that, at least in the criminal context, "any other person" includes non-licensees.

The Superior Court did not dispute Klar's characterization of *Randall*, but it emphasized that *Randall* was a criminal case. The instant case, like this Court's decision

___

[13] Trial Ct. Op., 10/4/2017, at 12.

[14] *Klar v. Dairy Farmers of America, Inc.*, 268 A.3d 1115 (Pa. Super. 2021).

[15] The referenced "board" is the Pennsylvania Liquor Control Board. *See* 47 P.S. § 1-102. The Pennsylvania Liquor Control Board operates liquor stores throughout the Commonwealth. *See* 47 P.S. §§ 3-301 – 3-306.

[16] 47 P.S. § 4-493(1) (emphasis added). The Dram Shop Act uses an archaic spelling of the word "employe." *See Harmon v. Unemployment Comp. Bd. of Rev.*, 207 A.3d 292, 310 n.1 (Pa. 2019) (Wecht, J., concurring). Although we reproduce the statute accurately in direct quotations, when referring to its language more generally, we utilize the more common contemporary spelling of "employee."

[17] 133 A.2d 276 (Pa. Super. 1957).

in *Manning*, was civil in nature. And in the civil context, the Superior Court stated, *Manning* suggests that "DFA, as a non-licensee, is not subject to the standard applicable to licensees under Section 4-493(1)."[18] On the Superior Court's reading of *Manning*, by holding that the non-licensee defendants in that case could not be held civilly liable for a violation of the Dram Shop Act, this Court effectively "held that the statutory phrase 'any other person' did not encompass non-licensees."[19]

As in the trial court, Klar sought to distinguish *Manning* on the basis that DFA collected money from its employees to pay for the alcohol at the golf outing. On Klar's account, this fact placed DFA outside the ambit of *Manning*'s protection of non-licensees, inasmuch as *Manning* referred to non-licensees "who furnish intoxicants *for no remuneration*."[20] The Superior Court disagreed. The Superior Court reasoned that "the presence or absence of remuneration is neither relevant nor dispositive under the plain terms of Section 4-493(1): the statute clearly prohibits the selling, *furnishing, or giving* of liquor or beer 'to any person visibly intoxicated.'"[21] That is, "selling" alcohol or receiving "remuneration" for it is not essential to a violation of the Dram Shop Act—"furnishing" or "giving" alcohol to a visibly intoxicated person also violates the statute, even if there is no exchange of money whatsoever. In the Superior Court's view, the dispositive consideration was whether DFA was a "licensee." Because it undisputedly was not, the court concluded that DFA could not be held liable for a violation of the Dram Shop Act.

The Superior Court further rejected Klar's suggestion that DFA should be deemed to have assumed "licensee status" by virtue of its receipt of funds from its employees.

---

[18]  *Klar*, 268 A.3d at 1125.

[19]  *Id.* (emphasis omitted).

[20]  *Manning*, 310 A.2d at 76 (emphasis added).

[21]  *Klar*, 268 A.3d at 1125 (quoting 47 P.S. § 4-493(1)) (Superior Court's emphasis).

Klar's sole authority for this proposition was a Court of Common Pleas decision, *Hinebaugh v. Pennsylvania Snowseekers Snowmobile Club*,[22] in which the court concluded that a private club assumed "licensee status" by selling alcohol to its members on a per-drink basis. The Superior Court declined to follow the lead of *Hinebaugh*, noting that it was not bound by decisions of a Court of Common Pleas. In any event, the Superior Court explained, *Hinebaugh* relied upon the expansive definition of "any other person" that emanated from *Randall*, which was in tension with this Court's decision in *Manning*, at least in the civil context.[23]

Finally, the Superior Court rejected Klar's invocation of common-law negligence principles. Like the trial court, the Superior Court reasoned that such a claim was squarely foreclosed by this Court's holding in *Klein* that "there can be no liability on the part of a social host who serves alcoholic beverages to his or her adult guests."[24] Klar sought to parry this conclusion by reiterating that DFA received "remuneration" for the alcohol and, thus, was not truly a "social host." The Superior Court opined that Klar's characterization was undermined by his own statement of the facts in the complaint, which described DFA as requiring the monetary contribution merely to "offset costs and expenses" of the golf outing—not to turn a profit.[25]

In the Superior Court's view, the situation was analogous to decisions that involved the "collective purchase" of alcohol by a group, a scenario that courts have not viewed as a "sale" from one member of the group to the others. In the nineteenth-century case of

---

[22]    63 Pa. D. & C.4th 140 (C.C.P. Lawrence 2003).

[23]    *See Klar*, 268 A.3d at 1127.

[24]    *Klein*, 470 A.2d at 511.

[25]    *Klar*, 268 A.3d at 1128 (quoting Complaint ¶ 9).

*Commonwealth v. Peters*,[26] three men split the cost of a bottle of whiskey that they proceeded to share. The Superior Court concluded that the man who made the purchase with the joint funds did not, in turn, "sell" the whiskey to the other two; rather, they all purchased it together.[27] The same principle appeared almost exactly one hundred years later, in the Superior Court's decision in *Brandjord v. Hopper*.[28] There, the Superior Court affirmed the dismissal of a suit against a group of individuals who purchased beer together for a tailgate party at a Philadelphia Eagles game,[29] one of whom later drove drunk and caused a motor vehicle collision. The Superior Court applied this Court's decision in *Klein* to conclude that the drunk driver's companions were not liable for the resulting injuries by virtue of their collective purchase. *Klein*, the court stated, was not intended "merely to protect hosts of parties," but rather embodied a principle that ordinary, competent adults are generally accountable for their own actions.[30] The driver "chose to drink and chose to drive," and that was the proximate cause of the injuries—not the mere fact that his friends also had chipped in to buy the beer.[31]

In the instant case, the Superior Court concluded that, in light of "collective purchase" decisions like *Peters* and *Brandjord*, "the presence of remuneration will not

---

[26]     2 Pa.Super. 1 (Pa. Super. 1898).

[27]     *Id.* at 4 ("One of the three, to effectuate the common purpose, acting for himself and the others and at their request, makes the purchase, pays the price and brings the article to a place appointed. The three, thereupon recognizing each other's rights in the thing purchased, jointly use it as their own. How can any one of the three be deemed the vendor of the others, or either of them?").

[28]     688 A.2d 721 (Pa. Super. 1997).

[29]     For some readers, it may be important to note that, on the day in question, the Eagles defeated the Dallas Cowboys. *Id.* at 722.

[30]     *Id.* at 726.

[31]     *Id.*

defeat the rule adopted by our Supreme Court in *Klein*, which holds that the conduct of a social host who furnishes alcohol to an adult is not the proximate cause of a subsequent occurrence."[32]  Because Klar's own averments suggested that DFA collected funds only to "offset costs and expenses," the Superior Court concluded that, under *Manning* and *Klein*, DFA was not the sort of entity upon which civil liability may be imposed, whether such liability is asserted under the Dram Shop Act or under a common-law negligence theory.

Klar petitioned this Court for review of the lower courts' decisions.  We granted *allocatur* on the question of whether, as a matter of law, Klar can state a viable claim against DFA.[33]  Because this appeal arises from a grant of judgment on the pleadings, our standard of review requires us to determine "whether, on the facts averred, the law makes recovery impossible."[34]  Where that inquiry touches upon matters of statutory

---

[32]    *Klar*, 268 A.3d at 1128.

[33]    Specifically, we granted *allocatur* to address the following question, as stated by Klar:

> Whether the Superior Court of Pennsylvania, by extending the holdings in controlling authority, erred in holding that a non-licensed host who invites guests to an event for purposes that are not purely social, and requires those who wish to attend to pay a fee in exchange for alcohol that will be provided on a self-serve-drink all you want basis, is not liable to an innocent third party who is injured as the result of a guest who left the event and was provided alcohol while visibly intoxicated during the event?

*Klar v. Dairy Farmers of America, Inc.*, 281 A.3d 299 (Pa. 2022) (*per curiam*).

[34]    *Cagey v. Commonwealth*, 179 A.3d 458, 463 (Pa. 2018) (citing *Emerich v. Phila. Ctr. For Human Dev., Inc.*, 720 A.2d 1032, 1034 (Pa. 1998)).  We have explained that "the same principles apply to a judgment on the pleadings as apply to a preliminary objection in the nature of a demurrer."  *Id.* at 463 n.2.  The facts pleaded in the complaint are taken as true, along with all inferences reasonably deducible from those facts; the court should grant judgment in the defendant's favor only where "the law says with certainty that no recovery is possible"; and any doubt in that regard must be resolved in favor of the non-moving party.  *Id.* (quoting *Emerich*, 720 A.2d at 1034).

interpretation, this is a pure question of law over which our standard of review is *de novo* and our scope of review is plenary.[35]

## II.

Although styled as a single issue, Klar's argument to this Court effectively divides into two claims: one premised upon the Dram Shop Act and decisions interpreting it, and one invoking common-law negligence principles. Klar's unifying theory is that everyone has a duty to avoid providing alcohol to visibly intoxicated individuals, regardless of one's status as a "licensee" under the Liquor Code. Klar emphasizes that this Court recognized such a duty, or at least suggested its existence, in a number of cases decided in the 1960s, particularly *Corcoran v. McNeal*[36] and *Jardine v. Upper Darby Lodge No. 1973, Inc.*[37] More recent decisions that limit the reach of potential liability were, according to Klar, wrongly decided.

In Klar's view, the Dram Shop Act imposes the asserted duty upon all persons, over and above common-law principles. He argues that the statute makes this clear by specifying that it applies to "any licensee or the board, or any employe, servant or agent of such licensee or of the board, or *any other person*."[38] A "person" is defined as "a natural person, association or corporation."[39] Thus, Klar suggests, DFA is a "person" within the meaning of the Dram Shop Act. And although Klar acknowledges that a "sale" of alcohol

---

[35]    *Franks v. State Farm Mut. Auto. Ins. Co.*, 292 A.3d 866, 871 n.9 (Pa. 2023).

[36]    161 A.2d 367 (Pa. 1960).

[37]    198 A.2d 550 (Pa. 1964).

[38]    Klar's Br. at 13 (quoting 47 P.S. § 4-493(1)) (Klar's emphasis).

[39]    *Id.* (quoting 47 P.S. § 1-102).

or receipt of "remuneration" is not essential to a violation of the Dram Shop Act,[40] he stresses that the statutory definition of "sale" includes "any transfer" of alcohol "for a consideration."[41] According to Klar, DFA's use of some portion of its employees' pooled money to purchase alcohol means that it received consideration and, thus, that it unlawfully "sold" alcohol to the visibly intoxicated Williams.

Klar draws a comparison between the Superior Court's decision in *Randall*, which he believes correctly interpreted "any other person" as applying to non-licensees, and this Court's later decision in *Manning*, which limited the application of the Dram Shop Act. Klar contends that this Court's approach in *Manning* "contorted" the statute and disregarded the "any other person" language.[42] However, Klar does not believe that his position necessarily would require us to overrule *Manning*. That decision reflected this Court's refusal to extend liability to "nonlicensed persons" who "furnish intoxicants for no remuneration."[43] Again, due to DFA's collection of the "monetary contribution" to pay for the expenses of the golf outing, Klar maintains, DFA received "remuneration" within the meaning of *Manning*, and thus is subject to Dram Shop liability.

Klar's assertion that DFA received "remuneration" for the provision of alcohol to its employees is also central to his argument that we should recognize a carveout from *Manning*'s holding for entities that assume "licensee status" by engaging in the unlicensed sale of alcohol. As he did below, Klar supports this theory with the Court of Common

---

[40]    *Id.* at 18-19 ("The requirement of remuneration is inconsistent with the Act which proscribes not only the selling of alcohol, but the furnishing or giving of alcohol to an intoxicated person.").

[41]    *Id.* at 13 (citing 47 P.S. § 1-102).

[42]    *Id.* at 18.

[43]    *Id.* at 22-23 (quoting *Manning*, 310 A.2d at 76).

Pleas' decision in *Hinebaugh*.[44] The purported "sale" in this case also, in Klar's view, distinguishes the matter from *Peters* and *Brandjord*, the "collective purchase" decisions upon which the Superior Court relied.[45] Those lower court cases, according to Klar, involved group purchases of alcohol for purely social reasons. Here, Klar claims, DFA's motivations were not purely social, inasmuch as it also sought to advance its interests as a "commercial enterprise"—that is, to "ingratiate" itself with its employees.[46]

While Klar contends that his arguments about "remuneration" adequately distinguish *Manning* without the need to discard its holding, his attack on our decision in *Klein* is more direct. First, where *Klein* held that "social hosts" are immune from liability in common-law negligence, Klar yet again suggests that the asserted remuneration here excludes DFA from the scope of that protection. Regardless, Klar declares that "*Klein* was wrongly decided."[47] We premised our holding in *Klein* upon the principle that competent adults are responsible for their own actions, and thus, non-licensee social hosts' provision of alcohol to them is not the *proximate cause* of a subsequent injury. Klar contends that this conclusion reflects a misapprehension of proximate cause, principally because he believes that intoxication renders one incompetent to determine whether one is capable of safely consuming more alcohol.[48] The responsibility to ensure that the intoxicated individual does not further indulge, according to Klar, lies with the host. Thus,

---

[44]   *Id.* at 27-28 (citing *Hinebaugh*, 63 Pa. D. & C.4th 140).

[45]   *Id.* at 29 (citing *Peters*, 2 Pa. Super. 1; *Brandjord*, 688 A.2d 721).

[46]   *Id.* at 31.

[47]   *Id.* at 33.

[48]   *Id.* at 34-35.

Klar asserts that "*Klein* should be revisited and overruled" to the extent that it would bar his recovery.[49]

Finally, as a matter of common-law negligence, Klar argues that this Court should recognize a duty on the part of all persons, or at least those in an employment relationship, to avoid serving alcohol to visibly intoxicated individuals. In service of this suggestion, Klar follows this Court's rubric under *Althaus v. Cohen*, which outlines a multifactorial inquiry that this Court utilizes to assess the prudence of imposing a novel common-law duty in tort.[50] Klar contends that each *Althaus* factor weighs in favor of recognizing a duty on the part of DFA, such that his common-law claim may proceed.[51] In light of the policy interests that would be served by the imposition of liability upon DFA, whether it be under a statutory or common-law theory, Klar argues, the Superior Court's decision must be reversed.[52]

DFA differs with Klar in all material respects. It argues that the lower courts correctly applied existing precedent to conclude that DFA was immune from liability under both the Dram Shop Act and any common-law negligence theory. To the extent that the

---

[49] *Id.* at 36.

[50] 756 A.2d 1166 (Pa. 2000). The *Althaus* factors are: "(1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution." *Id.* at 1169.

[51] Klar's Br. at 36-42.

[52] Klar's position is supported by *amicus curiae* the Pennsylvania Association for Justice ("PAJ"). PAJ does not endorse a wholesale eradication of legal protection of social hosts. Rather, it focuses heavily upon the meaning of "remuneration," the receipt of which, in PAJ's view, excludes one from the category of a "social host." PAJ contends that the Superior Court's decision "erase[d] the word remuneration from the statute," which constitutes error because "[t]he word remuneration has meaning and purpose in the statute." PAJ Br. at 5-6 (emphasis omitted). It is worth noting that, contrary to PAJ's suggestion, the word "remuneration" does not, in fact, appear in the Dram Shop Act. *See* 47 P.S. § 4-493(1). The word's relevance to this inquiry derives from its use in case law.

receipt of "remuneration" matters, DFA contends that there "was simply no remuneration" because it collected its employees' money not for profit, but only to offset the shared expenses of the golf outing, thereby serving merely as a "pass-through" for funds paid by the attendees to the golf course and the food and beverage vendors.[53] "DFA did not pay separately for the drinks, did not sell the drinks, did not receive compensation from the participants for the drinks, and did not serve the drinks."[54] This scenario, in DFA's view, was akin to the "collective purchase" decisions that the Superior Court cited, and did not reflect DFA's assumption of a *de facto* "licensee status." Rather, DFA asserts, it remained a "social host" that cannot be held liable, regardless of whether the claim arises under the Dram Shop Act or under the common law of torts.

DFA suggests that, at bottom, Klar's argument is premised upon his assertion that our decisions addressing this area of law over the past half-century were all wrongly decided and must be summarily discarded. DFA discerns no deficiencies in our precedents, and suggests that abandoning them in favor of Klar's view would represent a "seismic shift" in expanding the scope of potential liability.[55] Such a drastic change is particularly unwarranted, DFA argues, because the General Assembly has had ample time and opportunity to correct this Court's application of the law if it wished to do so. The fact that it has not made such a course correction, DFA argues, indicates that the prevailing cases were soundly decided.

### III.

We begin with the language of the Dram Shop Act and the relevant decisions that have interpreted and applied it. We then consider the viability of Klar's position under

---

[53]     DFA's Br. at 11 (emphasis omitted).

[54]     *Id.* at 14.

[55]     *Id.* at 26.

principles of common-law negligence. No matter which theory we apply, Klar's action against DFA cannot survive.

**A.**

Discerning the meaning of the Dram Shop Act is a question of statutory interpretation. As discussed throughout this opinion, however, we do not write upon a blank slate; the statutory language is the subject of longstanding and directly applicable precedent that has given the Dram Shop Act a particular meaning and scope. Still, as always when we interpret a statute, we begin with the text itself.[56]

The Dram Shop Act provides, in relevant part:

> **It shall be unlawful--**
>
> **(1) Furnishing Liquor or Malt or Brewed Beverages to Certain Persons.** For any licensee or the board, or any employe, servant or agent of such licensee or of the board, or any other person, to sell, furnish or give any liquor or malt or brewed beverages, or to permit any liquor or malt or brewed beverages to be sold, furnished or given, to any person visibly intoxicated . . . .

47 P.S. § 4-493(1).

---

[56] In all matters of statutory interpretation, we are guided by the Statutory Construction Act of 1972, 1 Pa.C.S. §§ 1501-1991. "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." *Id.* § 1921(a). "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Id.* § 1921(b). As we frequently note, the "plain language of a statute generally provides the best indication of legislative intent." *Commonwealth v. Rosario*, 294 A.3d 338, 346 (Pa. 2023) (quoting *Commonwealth v. Lehman*, 243 A.3d 7, 16 (Pa. 2020)). When a statute's language is not clear and unambiguous, however, we turn to the tools of statutory construction in order to ascertain the intent of the General Assembly. *See Commonwealth v. Cousins*, 212 A.3d 34, 39 (Pa. 2019) (quoting *Commonwealth v. Ramos*, 83 A.3d 86, 90-91 (Pa. 2013)) ("We will only look beyond the plain meaning of the statute where the words of the statute are unclear or ambiguous."); 1 Pa.C.S. § 1921(c) (listing considerations in discerning legislative intent).

As noted above, a central thrust of Klar's argument is that, notwithstanding the contrary holding of *Manning*, the Dram Shop Act's applicability to "any other person" must mean that a non-licensed entity such as DFA falls within its mandate. On the surface, the simplicity of this position has appeal, and we cannot say that Klar's interpretation is facially unreasonable. However, viewing the language in its full context, as we must,[57] there are features of both Section 493(1) and other provisions in the Liquor Code that undercut Klar's suggested reading, and which militate against giving the phrase "any other person" its broadest possible construction.

First and foremost, the Dram Shop Act does not apply merely to "any person." Rather, it imposes an obligation upon "any licensee or the board, or any employe, servant or agent of such licensee or of the board, or any other person."[58] If the statute were intended to sweep as broadly as Klar suggests, there would have been no reason for the General Assembly to specify particular persons and entities that it sought to regulate, to wit, licensees, the board, and the employees, servants, or agents of such. Because any licensee or employee of a licensee constitutes a "person" under the Liquor Code,[59] the status of the person, on Klar's reading, would be a wholly extraneous consideration. There would be no distinction between specifically listed entities, such as licensees, and everyone else. Such an interpretation of "any other person" therefore renders duplicative the immediately preceding list of categories—"any licensee or the board, or any employe, servant or agent of such licensee or of the board." In the language of our statutory

---

[57] *See A.S. v. Pa. State Police*, 143 A.3d 896, 906 (Pa. 2016) ("In construing and giving effect to the text, 'we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear.'") (quoting *Roethlein v. Portnoff Law Assoc.*, 81 A.3d 816, 822 (Pa. 2013)).

[58] 47 P.S. § 4-493(1).

[59] As Klar stresses, the Liquor Code defines "person" to include a "natural person, association or corporation." 47 P.S. § 1-102.

construction jurisprudence, Klar's interpretation thus transforms the very first words of the Dram Shop Act into "mere surplusage"—a consequence that we must avoid in light of our duty to ensure that we "give effect to all its provisions."[60]

The deficiencies in Klar's suggested interpretation become even more apparent when we consider the operative language in the broader context of the Liquor Code. The Dram Shop Act's wording is unique within the Liquor Code, as it is the only provision that features the precise formulation at issue, applying expressly to a list of specifically enumerated persons and entities, followed by "any *other* person." By contrast, the Liquor Code contains numerous provisions that unmistakably apply to all persons, with no reference to specific members of that class. Just a few subsections below the language at issue, Section 493(4) provides that it is unlawful "[f]or any person, to hawk or peddle any liquor or malt or brewed beverages in this Commonwealth."[61] Section 491(1) makes it unlawful "[f]or any person" to sell or offer to sell liquor without a license.[62] Sections 492(2) and 492(3) similarly declare it unlawful "[f]or any person" to sell malt or brewed beverages without a license, whether for on-site consumption or not.[63] Section 492(1)

---

[60]     1 Pa.C.S. § 1921(a); *see Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC,* 194 A.3d 1010, 1034 (Pa. 2018) ("When interpreting a statute, courts must presume that the legislature did not intend any statutory language to exist as mere surplusage; consequently, courts must construe a statute so as to give effect to every word.").

[61]     47 P.S. § 4-493(4).

[62]     *Id.* § 4-491(1) ("It shall be unlawful . . . [f]or any person, by himself or by an employe or agent, to expose or keep for sale, or directly or indirectly, or upon any pretense or upon any device, to sell or offer to sell any liquor within this Commonwealth, except in accordance with the provisions of this act and the regulations of the board.").

[63]     *Id.* § 4-492(2) ("It shall be unlawful . . . [f]or any person, to sell to another for consumption upon the premises where sold or to permit another to consume upon the premises where sold, any malt or brewed beverages, unless such person holds a valid retail dispenser license or a valid liquor license issued by the board authorizing the sale of malt or brewed beverages for consumption upon such premises."); *id.* § 4-492(3) ("It (continued…)

states that it is unlawful "for any person" to manufacture malt or brewed beverages above a certain annual limit, absent a license to do so.[64] This is only a small sample of provisions that use "any person" in the same encompassing manner. Such provisions illustrate that, when the General Assembly sought to apply a mandate to *all* persons without qualification, it said exactly that. If the legislature intended for the Dram Shop Act to have the same scope as these provisions, then it would have phrased Section 493(1) in the same unqualified terms. It did not do so. Rather, the General Assembly specifically listed persons and entities to which the Dram Shop Act applies. That decision, and each term the legislature chose to embody it, must be given meaning.

But if the Dram Shop Act does not apply to all persons, a question naturally arises: to whom does "any other person" refer? After all, in the same way that we cannot read the preceding list of persons and entities out of the statute, we also cannot disregard these words. The answer to that question follows from the observation that the Dram Shop Act provides a list of specific categories to which it applies—"any  licensee or the board, or any employe, servant or agent of such licensee or of the board"—followed by a general category—"or any other person." Under the doctrine of *ejusdem generis* ("of the same kind or class"), "where general words follow an enumeration of persons or things, by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to the persons or things of the

---

shall be unlawful . . . [f]or any person, to sell to another any malt or brewed beverages not for consumption upon the premises where sold, unless such person holds a valid license permitting such sale.").

64      *Id.* § 4-492(1) ("It shall be unlawful . . . for any person, to manufacture malt or brewed beverages, unless such person holds a valid manufacturer's license for such purpose issued by the board. Malt or brewed beverages may be produced by any person without a license if such malt or brewed beverages are produced not for sale and total production does not exceed two hundred gallons per calendar year.").

same general kind or class as those specifically mentioned."[65] *Ejusdem generis* is an ideal tool for an instance such as this, where a general or "catch-all" term must be given effect, and where construing it in its broadest possible sense would run afoul of other interpretive principles. An *ejusdem generis* analysis suggests that, within the context of the Dram Shop Act, "any other person" encompasses persons who fall within the same general class as a "licensee," the "board," or an "employe, servant or agent" of a licensee or the board. All of those specifically listed persons and entities share an obvious common trait: they engage in the commercial sale of alcohol, whether through a tavern, restaurant, beer distributor, or state-run liquor store. It follows that the "other" persons mentioned immediately after these persons and entities are those who, notwithstanding their lack of a license, also engage in the business of selling alcohol.

This approach solves numerous problems posed by competing interpretations. Where Klar's expansive reading of "any other person" would turn the specifically listed categories into mere surplusage, our interpretation gives them each a distinct effect. But far from reading "any other person" out of the statute, our construction gives that language meaning, ensuring that it reaches any "other person" who shares the defining characteristics of those specified. It further accounts for the difference between the Dram Shop Act and the various provisions of the Liquor Code that apply generally to "any person," thereby respecting the legislature's decision to treat this provision differently. And, as discussed below, it is consistent with our decision in *Manning*. Accordingly, we hold that "any other person," as used in the Dram Shop Act, refers to persons and entities that fall into the same general category as a "licensee," the "board," or "any employe,

---

[65]    *Steele v. Statesman Ins. Co.*, 607 A.2d 742, 743 (Pa. 1992) (quoting BLACK'S LAW DICTIONARY (5th ed. 1983)).

servant or agent of such licensee or of the board"—to wit, non-licensed persons engaged in the commercial or quasi-commercial sale of alcohol, with the intent to profit thereby.[66]

Notably, Klar anticipates our interpretation with his alternative suggestion that DFA, by virtue of its collection of funds from its employees (and, perhaps, its receipt of "remuneration") to pay for the golf outing, assumed a "licensee status" sufficient to justify application of the Dram Shop Act. Although we agree with Klar that this is a viable theory, for the reasons discussed below, we find that Klar's factual averments do not suffice to establish a basis for imposing liability upon DFA in this case. Before addressing Klar's argument regarding "remuneration," however, we turn to our decision in *Manning*, to which much of that argument is directed.

In *Manning*, an employee drank beyond the point of visible intoxication at his employer's holiday party. A passenger in the intoxicated employee's vehicle, who was injured in a subsequent collision, sued the employer under the Dram Shop Act, contending that it was liable under the statute's "any other person" language. The trial court dismissed the complaint, finding that the employer was not the sort of entity to which Dram Shop liability may attach. The trial court noted that "there is no difficulty in finding ample case law to the effect that if one *in the liquor business* sells liquor to another when

---

[66] We note that the Superior Court rejected an *ejusdem generis* analysis in its 1957 decision in *Randall*. There, the Superior Court concluded that the Dram Shop Act's use of "any other person" made clear that it applied to all persons, and that the preceding list of specified persons and entities did not bear upon the meaning of that phrase. *See Randall*, 133 A.2d at 281. As *Randall* is a decision of a lower court, we are not bound by it. The Superior Court in the instant case distinguished *Randall* on the basis that it concerned criminal prosecution rather than civil liability. *See Klar*, 268 A.3d at 1123-24. Although this is true, we see no reason to conclude that the same statutory language carries a different meaning in a criminal context, absent any indication in the text. Rather than endorse the Superior Court's commentary on this point, we simply reject *Randall*'s statutory construction analysis, which fails to account for the context in which the words "any other person" appears.

he is visibly intoxicated," then he may be liable for resulting injuries.[67]  The question that vexed the trial court there was deciding "how far to extend the law," because under the broadest possible reading of the Dram Shop Act, "every political picnic, every Christmas party and every other social activity will become a hazardous undertaking if the Liquor Code is applied to them."[68]  Such expansive liability, the trial court reasoned, appeared to be "outside the contemplation of the legislature."[69]

This Court affirmed in a brief, *per curiam* opinion.  Albeit without substantial statutory analysis, we reasoned:

> Only licensed persons engaged in the *sale* of intoxicants have been held to be civilly liable to injured parties.  *Jardine v. Upper Darby Lodge No. 1973*, 198 A.2d 550 (Pa. 1964).  Appellant asks us to impose civil liability on nonlicensed persons like appellees, who furnish intoxicants for no remuneration.  We decline to do so.  While appellant's proposal may have merit, we feel that a decision of this monumental nature is best left to the legislature.[70]

It is clear that *Manning*'s primary focus was upon the *status* of the defendant, as we contrasted the employer in that case with the typical class of potential defendants:

---

[67]   *Manning v. Andy*, 51 Pa. D. & C.2d 324, 328 (C.C.P. Washington 1970) (emphasis in original).

[68]   *Id.*

[69]   *Id.* at 330.

[70]   *Manning*, 310 A.2d at 76 (citation modified) (emphasis in original).  Justice Pomeroy concurred, concluding that, because the "Liquor Code is primarily concerned with the regulation of licensees of the Liquor Control Board and others connected in one way or another with the liquor industry," there was no justification for imposing liability upon a "private individual in no way part of the liquor industry."  *Id.* at 77 (Pomeroy, J., concurring).  However, Justice Pomeroy suggested that a claim against a non-licensee may be viable under "ordinary tort law," without reference to the Dram Shop Act.  *Id.* Justice Manderino dissented, endorsing the Superior Court's rationale in *Randall* and opining that the plain language of the Dram Shop Act suggested its applicability to non-licensees.  *Id.* at 79-81 (Manderino, J., dissenting).

"licensed persons engaged in the *sale* of intoxicants."[71]  This rationale implicitly excluded non-licensees from the scope of the phrase "any other person" in the Dram Shop Act, or, at least, it excluded from the statute's reach persons who do not *behave* in the manner of a licensee, *i.e.*, those who "furnish intoxicants for no remuneration."  Although *Manning* did not undertake a painstaking analysis of the statutory language, there were (and are) compelling reasons not to read the phrase "any other person" in its broadest possible sense.

Thus, to the extent that Klar asks us to interpret "any other person" to include all non-licensees in all circumstances, we reject his suggestion as inconsistent with *Manning*, and we decline to disturb *Manning*'s holding in that regard.  To the contrary, we conclude that *Manning* is entitled to significant precedential value.  "The doctrine of *stare decisis* maintains that for purposes of certainty and stability in the law, 'a conclusion reached in one case should be applied to those which follow, if the facts are substantially the same, even though the parties may be different.'"[72]  This is "a principle as old as the common law itself."[73]  Without this commitment to precedent, "there would be no stability in our system of jurisprudence."[74]  Of course, *stare decisis* is not absolute, and there are countless instances in which courts can and do break from precedent.[75]  But Klar does not convince us that such action is warranted here.

---

[71]     *Id.* at 76 (emphasis in original).

[72]     *Stilp v. Commonwealth*, 905 A.2d 918, 966-67 (Pa. 2006) (quoting *Burke v. Pittsburgh Limestone Corp.*, 100 A.2d 595, 598 (Pa. 1953)).

[73]     *Commonwealth v. Alexander*, 243 A.3d 177, 195 (Pa. 2020) (quoting *Morrison Informatics, Inc. v. Members 1st Fed. Credit Union*, 139 A.3d 1241, 1249 (Pa. 2016) (Wecht, J., concurring)).

[74]     *Id.* (quoting *Flagiello v. Pennsylvania Hosp.*, 208 A.2d 193, 205 (Pa. 1965)).

[75]     *See id.* at 196-97.

One particular consideration is worthy of mention in this regard. *Manning* will turn fifty years old this year, and over its five decades of life, the General Assembly has never amended the Dram Shop Act to extend its reach beyond the limits that *Manning* placed upon it, notwithstanding the legislature's amendment of other provisions of the Liquor Code. This state of affairs implicates a presumption that we call "legislative acquiescence,"[76] a term of art for what courts have called the "special force" of *stare decisis* in matters of statutory construction, which follows from the fact that the legislature is "free to correct any errant interpretation of its intentions" by amending the statute in question.[77] This principle, like *stare decisis* itself, is not absolute, and we have held that application of the presumption is "discretionary, not mandatory."[78] There certainly are circumstances in which judicial errors warrant correction notwithstanding the legislature's inaction.[79] In this case, however, we find that the General Assembly's silence speaks volumes.

If the legislature truly sought to subject all persons in this Commonwealth to the strictures of the Dram Shop Act, regardless of whether they engage in commercial or quasi-commercial activity, then *Manning* reflected a drastic limitation that would have

---

[76] *See* 1 Pa.C.S. § 1922(4) (setting forth a presumption that "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language").

[77] *Hunt v. Pennsylvania State Police*, 983 A.2d 627, 638 (Pa. 2009) (quoting *Shambach v. Bickhart*, 845 A.2d 793, 807 (Pa. 2004) (Saylor, J., concurring)); *see also John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139 (2008) ("[S]*tare decisis* in respect to statutory interpretation has 'special force,' for 'Congress remains free to alter what we have done.'") (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 172-73 (1989)).

[78] *Commonwealth v. Small*, 238 A.3d 1267, 1285 (Pa. 2020) (quoting 1 Pa.C.S. § 1922 ("the following presumptions, among others, *may* be used")) (emphasis in *Small*).

[79] *Id.* (noting that not every mistaken interpretation of a statute places a "burden upon the General Assembly to detect our error and to marshal the resources to correct it").

been difficult to overlook or ignore. Indeed, *Manning* expressly placed the proverbial ball in the General Assembly's court, noting that a universal expansion of potential liability was a decision of "monumental nature" that was "best left to the legislature."[80] The lawmakers did not take up our suggestion. Indeed, by our count, the General Assembly has amended the statutory section in which the Dram Shop Act appears—47 P.S. § 4-493—a total of *thirty-seven* times since we decided *Manning*.[81] Not one of these amendments so much as hinted at the General Assembly's disapproval of our decision. Given the number of times that the legislature has declined the opportunity to change the law, we conclude that the doctrine of legislative acquiescence carries significant weight, and provides another reason not to disturb the holding of *Manning*.

Moreover, we note at this juncture our agreement with *Manning*'s characterization that the expansion of potential Dram Shop liability to every individual in Pennsylvania

---

[80] *Manning*, 310 A.2d at 76.

[81] *See* Act of March 13, 1974, P.L. 190, No. 35, § 1; Act of December 30, 1974, P.L. 1032, No. 335, § 1; Act of August 1, 1975, P.L. 161, No. 83, §§ 1, 2; Act of June 15, 1977, P.L. 12, No. 9, § 1; Act of July 11, 1980, P.L. 558, No. 117, § 5; Act of March 9, 1982, P.L. 174, No. 55, § 1; Act of May 9, 1984, P.L. 246, No. 54, § 6; Act of June 29, 1987, P.L. 32, No. 14, § 81; Act of December 7, 1990, P.L. 622, No. 160, § 5; Act of April 29, 1994, P.L. 212, No. 30, § 18; Act of October 5, 1994, P.L. 522, No. 77, § 7; Act of October 5, 1994, P.L. 537, No. 80, § 2; Act of May 31, 1996, P.L. 312, No. 49, § 15; Act of February 18, 1998, P.L. 162, No. 25, § 7; Act of June 18, 1998, P.L. 664, No. 86, §§ 14, 15; Act of November 10, 1999, P.L. 514, No. 47, § 10; Act of December 20, 2000, P.L. 992, No. 141, § 16; Act of February 21, 2002, P.L. 103, No. 10, § 20; Act of December 9, 2002, P.L. 1653, No. 212, §§ 25, 26; Act of December 16, 2002, P.L. 1806, No. 221, § 2; Act of May 8, 2003, P.L. 1, No. 1, § 4; Act of July 17, 2003, P.L. 63, No. 15, § 7; Act of July 5, 2004, P.L. 572, No. 71, § 1; Act of November 30, 2004, P.L. 1727, No. 221, § 3; Act of December 8, 2004, P.L. 1810, No. 239, § 9; Act of July 6, 2005, P.L. 135, No. 39, § 12; Act of January 6, 2006, P.L. 1, No. 1, § 6; Act of July 7, 2006, P.L. 584, No. 84, § 6; Act of November 29, 2006, P.L. 1421, No. 155, § 3.2; Act of July 16, 2007, P.L. 107, No. 34, § 5; Act of June 28, 2011, P.L. 55, No. 11, § 12; Act of December 22, 2011, P.L. 530, No. 113, § 18; Act of July 5, 2012, P.L. 1007, No. 116, § 8; Act of June 8, 2016, P.L. 273, No. 39, § 24; Act of November 15, 2016, P.L. 1286, No. 166, § 13; Act of December 22, 2017, P.L. 1237, No. 75, § 5; Act of November 25, 2020, P.L. 1222, No. 125, § 3.

would be a "monumental" decision. Liquor licensees are aware of the responsibilities that they undertake by becoming commercial purveyors of alcohol. They generally (or should) train their employees to deny service to visibly intoxicated persons. They often post signs in their establishments that communicate their legal obligation to deny such service. They purchase liquor liability insurance policies specifically to hedge against their legal exposure. Ordinary people do none of these things before hosting a social gathering. Albeit presumably lacking awareness of the particularities of our case law as a general rule, Pennsylvanians have in effect relied upon *Manning* for fifty years every time they host a holiday gathering, a neighborhood picnic, a dinner party, or any other event in which alcohol may be a part of the festivities. To upend this state of affairs and to cast a net of potential Dram Shop liability over every person without qualification would be, as *Manning* recognized, a decision of enormous magnitude. Given the role that *Manning* has played in providing stability and predictability to this area of law, we conclude that this is another reason to reaffirm *Manning*'s rejection of the expansive, open-ended interpretation of "any other person."

That said, we do not read *Manning* as foreclosing the possibility that liability may be imposed upon a non-licensed person who engages in the unlawful (*i.e.*, unlicensed) sale of alcohol. This proposition closely aligns with Klar's alternative argument that DFA should be deemed to have assumed "licensee status," or that it "stepped into the shoes" of a licensee.[82] Our construction of "any other person," via *ejusdem generis*, allows for such a theory. And while *Manning* refused to allow liability to be imposed upon "nonlicensed persons" who "furnish intoxicants for no remuneration,"[83] that decision said nothing about persons who *do* furnish alcohol for remuneration.

---

[82]     *See* Klar's Br. at 27.

[83]     *Manning*, 310 A.2d at 76.

This brings us to the centerpiece of Klar's argument—the suggestion that DFA, by collecting money from its employees to "offset costs and expenses"[84] of the golf outing, "sold" alcohol without a license and received "remuneration" for it, thus triggering the Dram Shop Act. Before proceeding down this path, we must lay a few foundations. First, the word "remuneration" appears nowhere in the Dram Shop Act; it is a term that is relevant to this inquiry only through its use in case law, particularly *Manning*. *Manning*, moreover, did not make clear what conduct, precisely, it meant to capture with the word. Standing alone, the term "remuneration" is generally synonymous with "payment" or "compensation."[85] In this sense, any exchange of money for a good or service may constitute remuneration, even when no party seeks to profit. One who incurs substantial financial costs to host a party, for example, and receives a single dollar from an appreciative (but apparently stingy) guest may, strictly speaking, be said to have received remuneration. This is not, however, the sort of scenario that *Manning* envisioned. Rather, *Manning* drew a contrast between the persons that it exempted from liability and the typical class of potential defendants: "licensed persons engaged in the *sale* of intoxicants."[86] In context, what *Manning* meant by "remuneration" relates to the word it emphasized vis-à-vis licensees: "*sale*." We decline to give *Manning*'s use of the word "remuneration" a totemic significance that would exclude a person from *Manning*'s protection merely because some amount of money changed hands, without regard for the circumstances or how closely they resemble the conduct of a licensee. Rather, consistent with our foregoing analysis of the statutory text, we conclude that the remuneration to

---

[84]    Complaint ¶ 9.

[85]    *See, e.g.*, *Remuneration*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Payment; compensation, esp. for a service that someone has performed.").

[86]    *Manning*, 310 A.2d at 76 (emphasis in original).

which *Manning* referred is the receipt of payment for the commercial or quasi-commerical sale of alcohol with the intent to reap a profit.

*Manning*, moreover, used "remuneration," or rather its absence, as a litmus for determining whether a person is subject to the Dram Shop Act in the first place. This is significant because the "sale" of alcohol or receipt of "remuneration" is not essential to a violation of the Dram Shop Act—the statute makes it unlawful to "sell, furnish or give" alcohol to a visibly intoxicated person.[87] Stated otherwise, the exchange of money is not the *sine qua non* of a violation of the Dram Shop Act. If a person is subject to the Dram Shop Act, then that person violates the statute by "furnishing" or "giving" alcohol to a visibly intoxicated person just as much as he or she does by "selling" the alcohol. Consider a bartender who gives free drinks to a visibly intoxicated patron—liability does not evaporate merely because the alcohol came free of charge. But bartenders are indisputably subject to the Dram Shop Act. As it concerns *non-licensees*, the question of whether there was a "sale" of alcohol or receipt of "remuneration" is relevant to determining whether the person is subject to the Dram Shop Act in the first place, *i.e.*, whether the non-licensee's conduct placed him into the same category as licensees and the like, thereby constituting "any other person" within the meaning of the statute. Put simply, under both *Manning* and our reading of the statute, receiving remuneration for alcohol goes to the question of *who* is subject to the Dram Shop Act, not *what* action they took that serves as the basis for asserting liability. The specific act that would constitute

---

[87]    47 P.S. § 4-493(1); *see Klar*, 268 A.3d at 1125 ("[A]lthough the *Manning* Court observed that the liquor was provided for 'no remuneration,' the presence or absence of remuneration is neither relevant nor dispositive under the plain terms of Section 4-493(1): the statute clearly prohibits the selling, furnishing, or giving of liquor or beer 'to any person visibly intoxicated.'"); Klar's Br. at 18-19 ("The requirement of remuneration is inconsistent with the Act which proscribes not only the selling of alcohol, but the furnishing or giving of alcohol to an intoxicated person.").

a violation of the statute—including "furnishing" or "giving" alcohol—is immaterial if the actor is not subject to the statute in the first place.

Thus, we agree with Klar that a non-licensee can assume what he calls a "licensee status" by engaging in the unlawful commercial or quasi-commercial sale of alcohol. Under our interpretation, such conduct does not require a special name, but rather, by *ejusdem generis*, simply places the non-licensee into the category of "any other person" within the meaning of the Dram Shop Act. But Klar does not benefit from our agreement in principle, because the facts that he pleaded do not establish the sort of "remuneration" that *Manning* envisioned and that we conclude is necessary to subject a non-licensee to the requirements of the Dram Shop Act. Klar has never suggested that DFA collected the funds from its employees in order to profit from the sale of alcohol. The facts pleaded in no way suggest that, by organizing a social function for its employees, DFA sought to enter the liquor trade. By averring that DFA asked its employees for a "monetary contribution to offset costs and expenses" of the golf outing,[88] Klar dispelled any suggestion that DFA organized the event in order to sell alcohol for financial gain. Moreover, when Klar characterizes the alcohol at the event as available to all of the attendees on a "self-serve, drink-all-you-want basis,"[89] and states that the "beer was placed in portable coolers for participants to serve themselves,"[90] he describes a scenario that differs markedly from anything resembling the commercial sale of alcohol. Although Klar has sought to portray DFA's conduct as nefarious or of questionable legality, the facts that he pleaded establish a social commonplace—pooling money to purchase party

---

[88]     Complaint ¶ 9.

[89]     Klar's Br. at 2; *Klar v. Dairy Farmers of America, Inc.*, 281 A.3d 299 (Pa. 2022) (*per curiam*) (punctuation modified).

[90]     Klar's Br. at 6.

supplies for all of the attendees to share and enjoy. The fact that those provisions included beer did not transform DFA into a *de facto* commercial beer distributor.[91]

In effect, Klar asks us to conclude that a group of friends pitching in money to purchase a case of beer is legally indistinguishable from the operation of an unlicensed speakeasy. Under his view, a social host who collects a few dollars from his or her guests as reimbursement for the party's expenses is no different than a person who sets up a booth on a sidewalk to sell shots of liquor to passersby. There is a distinction, both in law and in common sense. That distinction is whether the person alleged to have violated the Dram Shop Act behaves in a manner befitting a liquor licensee, *i.e.*, engaging in the commercial or quasi-commercial sale of alcohol, with the intent to obtain a profit.

For these reasons, the trial court was entirely correct to conclude that, in order to establish a basis for Dram Shop liability, the plaintiff must show that the defendant "is either a licensee, or stepped into the shoes of a licensee," and that here, the absence of "profit or other indicia of commercial sale of liquor" renders the Dram Shop Act inapplicable to DFA.[92] To be even more precise, we conclude that the absence of such indicia of commercial designs means that DFA does not fall into the category of a "licensee or the board, or any employe, servant or agent of such licensee or of the board,"

---

[91]     Klar also offers various suggestions that DFA's status as an employer should have some bearing upon the question of the Dram Shop Act's application. He claims, for instance, that DFA did not organize the golf outing for "purely social" reasons because, as an employer, its true intent was to "ingratiate" itself with its employees. Klar's Br. at 31. Klar does not offer any reason that an employment relationship should make any difference to the Dram Shop Act, beyond the fact that it fits the circumstances of this case. We find no merit in the proposition. Indeed, *Manning* also involved an event hosted by an employer for its employees, and this fact was wholly inconsequential to our decision there.

[92]     Trial Ct. Op., 10/4/2017, at 11.

or, by *ejusdem generis*, "any other person."[93] We further endorse the Superior Court's "collective purchase" rationale to the extent that it concluded that the collection of money from one's companions to purchase alcohol for the group is not akin to an unlawful "sale" of alcohol without a license.[94] This is an entirely sensible proposition, for it would be absurd to conclude that there is a legally significant difference between, on the one hand, a person giving another twenty dollars to support purchase of a forty-dollar bottle of liquor for them to share, and on the other, both individuals handing a liquor store cashier twenty dollars from their respective wallets or pocketbooks. The former scenario obviously does not transform the purchaser into a bootlegger or a bartender.

In sum, we conclude that the Dram Shop Act is inapplicable to DFA. Consistent with *Manning* and the statutory text, the Dram Shop Act's applicability to "any licensee or the board, or any employe, servant or agent of such licensee or of the board, or any other person" does not mean that every individual in this Commonwealth is exposed to Dram Shop liability regardless of the nature of his or her conduct. Rather, by *ejusdem generis*, the meaning of "any other person" is cabined by its context. The phrase refers to persons whose actions place them into the same category as the preceding entities, namely those who engage in the commercial or quasi-commercial sale of alcohol for profit. Those who do so thereby receive "remuneration" as understood in *Manning*. The mere pooling of

---

[93] 47 P.S. § 4-493(1). As discussed above, it is immaterial that the liability-triggering acts under the Dram Shop Act include not only "selling" alcohol, but also "furnishing" or "giving" it to a visibly intoxicated person. Because DFA is not subject to the Dram Shop Act in the first place, there is no action that it could take that would violate the statute's terms.

[94] *See Klar*, 268 A.3d at 1128 (discussing *Brandjord v. Hopper*, 688 A.2d 721 (Pa. Super. 1997), and *Commonwealth v. Peters*, 2 Pa.Super. 1 (Pa. Super. 1898)). Although the Superior Court discussed its decisions in *Peters* and *Brandjord* in the context of Klar's common-law negligence theories, this principle is likewise relevant to the question of whether a non-licensee should be found to have engaged in conduct that implicates the Dram Shop Act. In the ordinary "collective purchase" scenario, the answer is "no."

money for a collective purchase of alcohol for shared consumption, absent any indicia of commercial sale or profit-seeking, does not rise to the level that implicates the Dram Shop Act.

**B.**

Should we conclude, as we have, that Klar is unable to resort to the Dram Shop Act in his action against DFA, he seeks recourse in the common law of negligence.[95] He fares no better in that realm. At common law, Klar's position is foreclosed by longstanding and well-established precedent that we find no reason to disturb.

At the outset, it is worth understanding something of the history of the relationship between the Dram Shop Act and the common law. Dram shop acts, generally, are a vestige of a bygone era.[96] They were a product of the temperance movement that grew throughout the nineteenth and early twentieth centuries[97]—the same movement that ultimately culminated in our nation's thirteen-year-long experiment with Prohibition under

---

[95] A common-law negligence claim requires proof of the following elements: "(1) the defendant owed the plaintiff a duty or obligation recognized by law; (2) the defendant breached that duty; (3) a causal connection existed between the defendant's conduct and the resulting injury; and (4) actual damages occurred." *Grove v. Port Auth. of Allegheny Cnty.*, 218 A.3d 877, 889 (Pa. 2019).

[96] The very term "dram shop" is an anachronism. *See* Daphne D. Sipes, *The Emergence of Civil Liability for Dispensing Alcohol: A Comparative Study*, 8 REV. LITIG. 1, 2 n.2 (1988) ("'Dramshop' is an antiquated term that refers to a tavern or person who serves liquor by the measurement of a dram, or an amount less than one gallon.").

[97] *See* Mary M. French, Jim L. Kaput, & William R. Wildman, *Social Host Liability for the Negligent Acts of Intoxicated Guests*, 70 CORNELL L. REV. 1058, 1065 (1985) (hereinafter, "French") ("Dramshop acts, first introduced into state codes in the nineteenth century, were part of the nineteenth and early twentieth centuries' campaign for temperance. Historians have referred to the temperance movement, active at both the state and federal levels, as a battle between the 'wets' and the 'dries.' The 'wets' sought to defeat measures limiting or prohibiting the availability of alcohol. The 'dries' supported such measures. The temperance movement's crusade for 'gallon laws,' state prohibition, and dramshop acts indicates that the movement sought to cut off the supply of liquor rather than attempt to reform the individual drinkers.") (footnotes omitted).

---

the Eighteenth Amendment to the United States Constitution.[98]  The very reason for the enactment of dram shop laws was the fact that, under the common law of torts, liability could *not* be imposed upon one who provided another with alcohol.[99]  Such statutes were an effort to supersede the common law—to provide an avenue for imposing liability upon the purveyors of alcohol where the common law did not.

There are some courts in the modern era that have approved the application of ordinary negligence principles to impose civil liability upon non-licensees, or "social hosts," without reference to a dram shop act.[100]  In the past, some Justices of this Court have expressed support for the proposition.  In his *Manning* concurrence, Justice Pomeroy suggested that a non-licensee could be held liable for negligence in overserving a visibly intoxicated person who then causes an injury, adding that "no legislative enactment is required to accomplish that result; it is ordinary tort law."[101]

This proposition echoed certain comments in this Court's decisions in *Corcoran* (1960) and *Jardine* (1964).  In *Corcoran*, which involved an action against a tavern for injuries inflicted by a drunken customer, this Court stated that the "liability of a tavern proprietor for damage done a patron under the circumstances herein discussed does not

---

[98]  U.S. CONST. amend. XVIII (repealed).

[99]  *See* French, *supra* n.97, at 1063 ("At common law the furnisher of intoxicating liquor was not liable for injuries caused by the drinker.  The drinker was solely responsible because the courts deemed the excessive consumption of alcohol, not its sale or gratuitous transfer, as the proximate cause of any resulting injuries.  Dramshop acts, however, abrogated the common law rule with respect to tavern owners who sell or give away alcoholic beverages under a state liquor license.") (footnotes omitted).

[100]  *See Klein*, 470 A.2d at 509 (discussing *Coulter v. Superior Court of San Mateo*, 577 P.2d 669 (Cal. 1979); *Figuly v. Knoll*, 449 A.2d 564 (N.J. Super. Ct. Law Div. 1982)).

[101]  *Manning*, 310 A.2d at 77 (Pomeroy, J., concurring).  Justice Manderino's dissent, although focusing more upon the scope of the Dram Shop Act, offered similar comment, stating that "Section 493(1) of the Liquor Code does not create the cause of action in this case.  The ordinary principles of negligence do that."  *Id.* at 81 (Manderino, J., dissenting).

depend on the [Dram Shop Act] or any statute."[102]  *Jardine*, which likewise concerned a claim against a tavern for overserving a customer, included a suggestion:  "The first prime requisite to de-intoxicate one who has, because of alcohol, lost control over his reflexes, judgment and sense of responsibility to others, is to stop pouring alcohol into him.  This is a duty which everyone owes to society and to law entirely apart from any statute."[103]

Because *Corcoran* and *Jardine* both involved actions against taverns—*i.e.*, liquor licensees—that directly implicated the Dram Shop Act, these statements unquestionably were *dicta*.  In both cases, the Court was applying the Dram Shop Act and addressing issues related to the application of the statute.  There was, accordingly, no reason to offer broader comment upon the hypothetical results of cases where the Dram Shop Act might not apply.  As such, this commentary in *Corcoran* and *Jardine* does not enjoy the status of binding precedent.[104]

Thus, although some opinions of this Court throughout the 1960s and 1970s suggested the potential viability of common-law negligence claims against non-licensee social hosts, these suggestions appeared only in minority opinions and *dicta*.  This is likely why, in our 1983 decision in *Klein*, we stated that the question of the common-law liability of social hosts was "in reality one of first impression in this jurisdiction."[105]  The *Klein* Court, in a binding majority opinion, refused to extend common-law liability to social hosts.

*Klein*'s analysis primarily consisted of a survey of the prevailing rules in other jurisdictions.  Although a handful of courts had allowed social-host liability in common-law

---

[102]     *Corcoran*, 161 A.2d at 370.

[103]     *Jardine*, 198 A.2d at 553.

[104]     *See Obiter Dictum*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive).").

[105]     *Klein*, 470 A.2d at 508.

negligence, far more refused to impose such liability, at least where the intoxicated person was a competent adult.[106] Thus, the *Klein* Court observed that "the great weight of authority supports the view that in the case of an ordinary able bodied man it is the consumption of the alcohol, rather than the furnishing of the alcohol, which is the proximate cause of any subsequent occurrence."[107] We added that this conclusion was "in accord with the recognized rule at common law."[108] The *Klein* Court was referring to the historical state of affairs prior to the adoption of dram shop acts around the nation, which, as discussed above, modified the common-law rule. Absent such legislative action, the common-law approach limited the liability of purveyors of alcohol.[109] We made clear that "[w]e agree with this common law view," and we consequently held that "there can be no liability on the part of a social host who serves alcoholic beverages to his or her adult guests."[110]

*Klein*'s commanding and precedential relevance to the instant case is obvious. Moreover, even if one accepts the questionable implications of *Jardine*'s *dictum*, that statement was couched in terms of the first element of a negligence claim—a general

---

[106] *See supra* n.100; *Klein*, 470 A.2d at 510 (citing *Chastain v. Litton Systems, Inc.*, 527 F.Supp. 527 (W.D.N.C. 1981), *vacated on other grounds*, 694 F.2d 957 (4th Cir. 1982), *cert. denied*, 462 U.S. 1106 (1983); *Cartwright v. Hyatt Corp.*, 460 F.Supp. 80 (D.D.C. 1978); *Fruit v. Schreiner, Alaska*, 502 P.2d 133 (Alaska 1972); *Kowal v. Hofher*, 436 A.2d 1 (Conn. 1980); *Miller v. Moran*, 421 N.E.2d 1046 (Ill. App. Ct. 1981); *Behnke v. Pierson*, 175 N.W.2d 303 (Mich. Ct. App. 1970); *Cole v. City of Spring Lake Park, Minn.*, 314 N.W.2d 836 (Minn. 1982); *Runge v. Watts*, 589 P.2d 145 (Mont. 1979); *Hamm v. Carson City Nugget, Inc.*, 450 P.2d 358 (Nev. 1969); *Schirmer v. Yost*, 400 N.Y.S.2d 655 (N.Y. App. Div. 1977); *Edgar v. Kajet*, 375 N.Y.S.2d 548 (N.Y. App. Div.1975) *aff'd* 389 N.Y.S.2d 631 (1976); *Tarwater v. Atlantic Co.*, 144 S.W.2d 746 (Tenn. 1940); *Halvorson v. Birchfield Boiler, Inc.*, 458 P.2d 897 (Wash. 1969)).

[107] *Klein*, 470 A.2d at 510.

[108] *Id.*

[109] *See supra* n.99.

[110] *Klein*, 470 A.2d at 510-11.

*duty* to cease giving alcohol to visibly intoxicated people.[111] *Klein* shut the door to social host liability through a different element of a common-law negligence claim—*proximate cause*. Thus, even if *Jardine*'s comment were not *dictum*, and even if *Klein*'s holding did not directly abrogate it, *Jardine*'s "duty" would, at least arguably, be dispositive of nothing, given that *Klein* deprived claims against social hosts of another essential element of the negligence tort.

*Klein* unmistakably articulates the common-law approach to social host liability in Pennsylvania, and it places Klar's common-law theory in this case in obvious jeopardy. Acknowledging this, Klar seeks to distinguish *Klein*, like *Manning* before it, based upon the asserted presence of "remuneration" in this case. But for the same reasons that we found this argument lacking in the context of the Dram Shop Act, we similarly conclude that the facts averred in this case provide no basis to deviate from *Klein*. Anticipating this conclusion as well, Klar asks us simply to overrule *Klein*. We decline to do so.

Klar's principal objection to *Klein* is that he believes it to have misapplied the concept of proximate cause. Klar argues that an intoxicated person is not competent to determine whether to cease drinking, and that the responsibility to prevent such overindulgence therefore lies with the alcohol's provider. "It cannot be argued with a straight face," Klar posits, "that a visibly intoxicated adult, including those who exercise poor judgment and those who are stricken with the disease of alcoholism, have the competency to determine if they can handle more alcohol without becoming a danger to others."[112] Common experience teaches otherwise. A great many people are perfectly capable of determining that they have "had a few too many," and that they should not, for

---

[111]  *Jardine*, 198 A.2d at 553 ("This is a duty which everyone owes to society and to law entirely apart from any statute.").

[112]  Klar's Br. at 35.

instance, drive an automobile. They need not rely wholly upon their companions to cut off their supply. Intoxication does not inexorably create a feedback loop of ever-greater intoxication. And seldom in the law does voluntary intoxication allow one to escape the consequences of one's own actions, or place the responsibility for that intoxication upon others. Furthermore, even allowing for the degree to which some dangerous behaviors may be compulsive for certain individuals, we do not make a habit of obligating their peers to step in on peril of ruinous liability. In short, Klar fails to provide a sufficient reason to discard *Klein*, which, like *Manning*, has provided stability and predictability to the law for decades. *Klein* remains the law of this Commonwealth.

We need not dwell upon Klar's final argument—that we should recognize a novel common-law duty of all persons, or at least all employers, to refuse to provide alcohol to visibly intoxicated persons. The effect of the proposition would be the same as the universal application of the Dram Shop Act; the ends would in this iteration be achieved through the common law rather than through statute. Moreover, it is questionable whether recognition of Klar's suggested duty would alleviate his *Klein* problem, given that *Klein*'s holding was premised upon the element of proximate cause.

At all events, for reasons discussed above, the *Althaus* factors[113] do not favor the "monumental" shift in approach that Klar calls for.[114] Among the *Althaus* factors are "the consequences of imposing a duty upon the actor" and "the overall public interest in the proposed solution."[115] In weighing these factors, we have emphasized that "the adjudicatory process does not translate readily into the field of broad-scale

---

[113]     *See supra* n.50.

[114]     *See Manning*, 310 A.2d at 76.

[115]     *Althaus*, 756 A.2d at 1169.

policymaking."[116]  This caution has engendered "reluctance" to make significant policy changes through the common law of torts, rather than leaving such decisions to the political branches of government.[117]  We have "adopted the default position that, unless the justifications for and consequences of judicial policymaking are reasonably clear with the balance of factors favorably predominating, we will not impose new affirmative duties."[118]  Indeed, "before a change in the law is made, a court, if it is to act responsibly must be able to see with reasonable clarity the results of its decision and to say with reasonable certainty that the change will serve the best interests of society."[119]

As discussed above in the context of the Dram Shop Act, the expansion of potential civil liability to all persons in this Commonwealth who host a gathering involving alcohol would be a policy decision of vast magnitude, the consequences and costs of which would be significant, widespread, and not entirely predictable.  Ordinary people do not undertake the legal duties and social obligations of liquor licensees merely by hosting a party, not even if they purchase alcohol together or reimburse each other for it.  To the extent that Klar suggests that the proposed duty could be restricted to employers, and that an employment relationship imposes some increased obligation vis-à-vis the provision of alcohol, we find no common-law basis for such a distinction when neither employer nor employee are engaged in the business of selling alcohol.[120]  As such, we decline Klar's invitation to modify the common law of social host liability.

---

[116]  *Lance v. Wyeth*, 85 A.3d 434, 454 (Pa. 2014).

[117]  *Seebold v. Prison Health Servs., Inc.*, 57 A.3d 1232, 1246 (Pa. 2012).

[118]  *Id.* at 1245.

[119]  *Cafazzo v. Cent. Med. Health Servs., Inc.*, 668 A.2d 521, 527 (Pa. 1995) (quoting *Hoven v. Kelble*, 256 N.W.2d 379, 392 (Wis. 1977)).

[120]  *See supra* n.91.

**IV.**

The lower courts did not err in concluding that DFA's act of purchasing and providing beer for the golf outing was insufficient, as a matter of law, to trigger civil liability exposure for the injuries caused by its intoxicated guest. This result is the same under both the Dram Shop Act and common-law negligence. As we did a half-century ago in *Manning*, we defer to the General Assembly, and remind that, if our interpretation of the Dram Shop Act is inconsistent with the legislature's intent, or if it wishes to supersede the approach that we apply under the common law, it may amend the statute accordingly.

The order of the Superior Court is affirmed.

Chief Justice Todd and Justices Donohue, Dougherty and Brobson join the opinion.

Justice Mundy did not participate in the decision of this matter.